MORTIMER B. ZUCKERMAN & another *vs.* GERALD W. BLAKELEY, JR. & another, trustees.

Middlesex.    March 11, 1975. — December 30, 1975.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Contract,* Valuation of real estate. *Words,* "Interest on deposits." *Interest.*

The record in a suit in equity supported an explanation that a "sublet clause," in a formula for determination at a future date of the value of a new office building over one-half of which was leased to a prime tenant by its owner, who was leased back considerable space by the prime tenant at the same rent and who also retained the remaining space for direct rental to the market, was added to a paragraph of the formula for ascertainment of the "annual average cash flow" and the "annual rent" in order to make clear in the case of sub-sublet space that the parties were to look to the sub-subleases for valuation purposes, and not to the lease back to the owner, and to apply the sub-subleases to categories designated in the formula according to whether space was leased for long terms or a short term or was vacant. [690-692]

In a liquidation agreement, a formula which provided that the "annual average cash flow" would include interest on deposits was not intended to include interest on the "float" in the absence of any provision in the agreement obligating the defendant to deposit such funds at interest or any proof that such interest existed or that its nonexistence was due to the defendant's culpability. [692-693]

BILL IN EQUITY filed in the Superior Court on September 28, 1972.

The case was heard by *Hallisey, J.,* and reported by him.

*Lewis H. Weinstein (Herbert L. Berman, Loyd M. Starrett & David J. Brody* with him) for the plaintiffs.

*Jerome P. Facher* for the defendants.

KEVILLE, J.   This action was brought by Mortimer B. Zuckerman and Edward H. Linde (Urban) against Gerald W. Blakeley, Jr., and Paul F. Hellmuth, trustees of Cabot, Cabot & Forbes Co. (CC&F), seeking specific performance of an agreement, an accounting and damages. The agreement was reached in order to expedite the liquidation of Urban's interests in several partnerships controlled by CC&F including Urban's ten percent interest in the partnership which owns the Boston Company Building (building). The agreement embodied a formula to establish the dollar value of Urban's interest in the building which Urban would relinquish in exchange for other properties of equal value. Urban exercised its option under the agreement to implement the formula on March 27, 1972. The present litigation ensued when, despite months of extensive negotiation, the parties and their counsel discovered that they could not agree upon the interpretation of the formula which they had constructed. The trial before a Superior Court judge was limited by agreement to the valuation of Urban's interest according to the formula.

The judge filed a memorandum of decision including findings of fact. His interlocutory finding and order stated Urban's interest in the building to be $3,747,132. He denied CC&F's motion to permit the reception of additional evidence. He ordered that the Superior Court retain jurisdiction of the cause for further hearing on remaining issues and reported the matter heard by him for determination by this court. Mass. R.Civ.P. 64, 365 Mass. 831 (1974). He designated Urban appellant in the proceedings on the report. Mass. R.A.P. 5, 365 Mass. 847 (1974).

We have before us with the judge's findings of fact a transcript of the evidence. We do not understand that in

these circumstances the scope of review is significantly different under the "clearly erroneous" standard imposed by Mass. R.Civ.P. 52(a),[1] 365 Mass. 816 (1974), from the "plainly wrong" requirement which it has replaced (*Lowell Bar Assn.* v. *Loeb,* 315 Mass. 176, 178 [1943]) or that we may no longer find facts in addition to those found by the judge. See *Sulmonetti* v. *Hayes,* 347 Mass. 390, 391-392 (1964); *Harvard* v. *Maxant,* 360 Mass. 432, 433 (1971); *Juergens* v. *Venture Capital Corp.* 1 Mass. App. Ct. 274 (1973).

The building was constructed by CC&F in the period 1967-1970. When the agreement was executed on January 6, 1972, ninety-five percent of its space was occupied. The building consists of forty-one floors and 779,000 square feet of rentable space. While retaining the remaining space for direct rental to the market, CC&F rented approximately fifty-five percent of the building to a prime tenant, Boston Safe Deposit and Trust Company (Boston Company) which at the same time leased back about half of that space to CC&F at the same rent. This sublet arrangement was essentially a wash transaction which, while providing no net cash flow to CC&F, had the effect of placing the Boston Company's credit behind the permanent financing of the building[2] and enabled CC&F to sub-sublet the leased back space to the market at higher rentals. For valuation purposes under the formula the lease back to CC&F, following the lease to the Boston Company, was ignored.

The formula in pertinent part is set out in the margin in configuration as it appears in the agreement.[3] It provided

---

[1] See the Reporter's notes to Rule 52(a) Mass. R.Civ.P. which tracks Fed.R.Civ.P. 52(a). *United States* v. *United States Gypsum Co.* 333 U.S. 364, 394-395 (1948).

[2] The lease and the lease back were also drafted in such a way that gradually within a period of thirty years the Boston Company might recapture (at the original rent) the sublet space to use for its own purposes.

[3] The value of the Building shall be determined in the following fashion:

a) The annual average cash flow from the Building shall be estab-

that the "annual average cash flow" be established, that there be deducted therefrom the annual debt service on the financing and that the resulting figure be capitalized with Urban's interest being ten percent of that result. The annual average cash flow was to be reached by adding the values assigned to the leases of office space and garage space and to miscellaneous income from the building.

Central to the construction of the formula were the anticipation, shared by both parties, that the building would prosper and Urban's expectation that it would obtain a fair share of the appreciation of CC&F's interest in the building as the result of increased rents. The basic approach was to establish a fair valuation at a future date. To this

lished as of the date on which either party gives notice of its desire to require an exchange.

Annual average cash flow shall be determined by adding:

i) Annual rent on space under lease for a term, the unexpired portion of which is ten (10) years or more from April 1, 1971, and leases with options to extend beyond April 1, 1981 at the rent payable during the original term, after deduction therefrom of $2.63 per square foot of space covered by such leases, and escalation in rent by reason of increases in real estate taxes and operating costs.

ii) For space under lease, the unexpired term of which is ten (10) years or less from April 1, 1971, other than leases with options to extend beyond April 1, 1981 at the rent payable during the original term, and for space vacant at the time of exercise of such right, the figure of $7.37 shall be escalated by a factor of four per cent (4%) per year compounded from April 1, 1971 to October 1, 1978, and the result of such computation shall be multiplied by the number of square feet of gross leaseable floor area (New York building standard) in the space so under lease, the unexpired term of which is ten (10) years or less from April 1, 1971, other than leases with options to extend as aforesaid, and space vacant at the time of exercise of such right,

[The $7.37 figure represents the present average base rent of $10.00 per square foot prevailing in the Building, less the amount of $2.63 allocable to base operating costs and base taxes, i.e., exclusive of escalation borne by the tenants.] (brackets original)

iii) For garage space, not committed by agreements or committed by agreements, the unexpired term of which is ten (10) years or less from April 1, 1971, the figure of $75.00 per car space per month shall be escalated by the same factor in subpara-

Zuckerman *v.* Blakeley.

end, leases of office space were placed in two categories: par. a) i) long term (leases extending to or beyond April 1, 1981) and par. a) ii) short term (leases expiring on or before April 1, 1981). Long term space was to be valued for cash flow purposes at the actual annual rents stated in the leases, less a deduction of $2.63 a square foot for expenses, while in the case of short term leases, the parties agreed to disregard actual rental income and to substitute therefor an agreed annual rental figure at a negotiated rate which came to $9.89 a square foot.[4] Vacant space was to be valued at the same rate. Thus, short term space, whether generating more or less income than $9.89 a square foot (or no income in the case of vacant space) was to be valued

graph ii) above from April 1, 1971 through October 1, 1978, and such figure shall be multiplied by twelve (for an annual figure) and multiplied by the number of such spaces, after deduction therefrom of base operating costs and base taxes included in such $75.00 per car per month figure. Where garage space is held by the Building under a lease from third parties, the rent shall, of course, be treated as an operating cost, and

iv) Miscellaneous income after deduction of expenses attributable to such income, including, without limitation, service income and interest on deposits, shall be projected on a fair and equitable basis;

and there shall be deducted from such sum annual debt service on the above referenced THIRTY-FIVE MILLION and NO/100 Dollars ($35,000,000.00) financing as of the date on which such right is exercised.

Where space leased has been sublet to CC&F, and CC&F in turn has sublet, annual rent, for the purposes of this provision, shall be determined on the basis of the CC&F sublet and not the overlease to CC&F.

b) The annual average cash flow so determined shall be capitalized on a capitalization rate which is one hundred fifty (150) basis points above the then current Federal Government long-term bond rate; and

c) The result of such computation shall, for the purposes of this Memorandum, be the value of the equity in the Building, and Urban's share thereof, and the value to be exchanged for like value, shall be ten per cent (10%) thereof.

[4] This figure was derived by taking a constructed figure of $7.37 (an agreed average base rent of $10.00 a square foot less $2.63 expenses) and escalating that figure by a factor of 4% a year compounded for seven and a half years.

at that figure. No dispute exists between the parties with respect to pars. a) i) and ii) except to the extent that they may be related to space in the building characterized by the parties as "sublet space."

We are called upon to review the findings and conclusions of the judge with respect to two portions of the formula, his interpretation of a sentence referred to by the parties as the "sublet clause" and the phrase "interest on deposits" within the miscellaneous income provision. The principal bone of contention, the sublet clause, reads:

> Where space leased has been sublet to CC&F, and CC&F in turn has sublet, annual rent, for the purposes of this provision, shall be determined on the basis of the CC&F sublet and not the overlease to CC&F.

The judge found and the parties do not dispute that this clause directs attention to CC&F's sub-subleases to the market and not to the lease from CC&F to the Boston Company or its lease back. At that point they part company. The judge found the sublet clause to be ambiguous with respect to how sub-sublet space was to be valued, so he received, without objection, extrinsic evidence for enlightenment. He concluded in substance that CC&F was correct in its assertion that the parties intended that the actual annual rent for that space should be used for valuation purposes. He then, we think incongruously, determined, in contrast to the treatment accorded to the valuation of all other space in the building and the garage space as well, that no deduction should be made for expenses.[5, 6]

---

[5] The record makes clear that neither party had espoused this result (Urban because of its reliance upon pars. a) i) and ii) of the formula and CC&F because such a conclusion would necessarily add several thousands of dollars to the total annual average cash flow from which Urban's share was to be derived). Since Urban is the beneficiary of the judge's conclusion that expenses should not be deducted, it now, understandably, argues in support of this result.

[6] Since we conclude that the judge's failure to deduct expenses from rental income from the sub-sublet space was clearly erroneous, it becomes unnecessary to pass upon his denial of CC&F's motion that he entertain additional evidence on this issue.

In the case of sub-subleases, the judge's conclusion also runs counter to his finding that "the whole purpose of the valuation section is to determine the annual *net* income" (emphasis supplied).

Urban's position, as found by the judge, was essentially that the parties intended to value sub-sublet space in the same fashion as other space let out to the market by CC&F. And, thus, long and short term leases of that space should be sorted out and long term space valued, pursuant to par. a) i), at the rent charged in the long term leases less the expense factor, and short term space valued at $9.89 a square foot under par. a) ii).

We find other considerations more persuasive than CC&F's contentions or the judge's analysis included in his memorandum of decision. In the first place, the position assigned to the sublet clause at the foot of par. a), and its configuration as an unindented, unnumbered sentence, in contrast to the format of the four separate categories of value which precede it in the formula, graphically and, in the circumstances, vividly support Urban's position. This formula was not the product of haphazard draftsmanship. It had been painstakingly negotiated by experts on both sides[7] and drawn with the assistance of counsel.[8]

Bearing in mind that, as the judge found, fair sharing of anticipated escalation in rental values and the determination of net income from the building were prominent considerations in the development of the formula, we find it almost inconceivable that these considerations would have been ignored in the language of the sublet clause if the parties had in fact intended to establish in that clause a separate category[9] for valuation purposes, particularly

---

[7] Zuckerman for Urban, and Emerson for CC&F. Zuckerman had been chief financial officer of CC&F and active in the financing of the building. Emerson was his replacement as chief financial officer.

[8] The judge's finding that counsel for Urban was the draftsman of the sublet clause is not entirely accurate. The record shows that counsel for CC&F had a decisive hand in its formation.

[9] If this had been the intent, the sublet clause could be expected to have been labeled "v)" and positioned before the section dealing with

in view of the fact that sub-sublet space encompassed more than 200,000 square feet in the building. While the recapture provision in the lease back from the Boston Company to CC&F tended gradually to diminish Urban's opportunity to share in the escalated value of that space, it did not eliminate it.

We conclude that the record supports the explanation that the sublet clause was added to par. a) to make clear in the case of sub-sublet space that the parties were to look to the sub-subleases and not to the lease back to CC&F and to apply them for valuation purposes to the appropriate category, either par. a) i) or a) ii), depending upon whether the space was leased for a long or short term (or was vacant).[10]

Turning to the second issue, the question is whether "interest on deposits" under the miscellaneous income provision was intended to include interest on the "float."[11] The provision reads as follows:

> iv) Miscellaneous income after deduction of expenses attributable to such income, including, without limitation, service income and interest on deposits, shall be projected on a fair and equitable basis;

We agree with the judge, who concluded that "interest on deposits" was not intended to include interest on the float. He found that the common ordinary meaning of "interest on deposits" is money actually earned on actual deposits (cf. *Hayes* v. *Commissioner of Corps. & Taxn.* 261 Mass. 134, 136 [1927]; *Wolbach* v. *Commissioner of Corps. &*

---

debt service deduction, debt service being deducted from the "sum" of all components of annual average cash flow. Had the intention been to modify or explain only a) i) as CC&F appears to contend, it would properly have been placed immediately following that section, which was the treatment accorded the clarification of par. a) ii).

[10] In his computation, the judge appears to have treated vacant sublet space in this manner although his findings furnish no explanation for it.

[11] That is, income from the building assumed by Urban to have been received by CC&F on the first of the month, retained by it and paid out for corresponding expenses at the end of the month or later.

*Taxn.* 268 Mass. 365, 370-371 [1929]) and that Urban had not met its burden of proving either that actual interest existed (cf. *Strauss* v. *United Telegram Co.* 164 Mass. 130, 132 [1895]) or that its nonexistence was due to CC&F's culpability. Contrast *Forbes* v. *Ware,* 172 Mass. 306, 310 (1899).

Zuckerman, who had been CC&F's senior financial officer, acknowledged that he was familiar with the company's cash requirements and that income from the building was not deposited but always used in the operation of the company or elsewhere. If funds were received which answered the description of the float, there was no provision in the agreement obligating CC&F to deposit such funds at interest. As the judge indicated, if Urban intended to have potential rather than actual interest from the float included in the cash flow, language should have been included in the formula which spelled that out.

The questions addressed to us in the report are answered in accordance with the foregoing discussion. The case is to stand in the Superior Court for further proceedings consistent with this opinion.

*So ordered.*