LUCILLE SANGUINETTI, trustee, & another *vs.* NANTUCKET
CONSTRUCTION COMPANY, INC. & another.[1]

Nantucket.    February 15, 1977. — April 14, 1977.

Present: HALE, C.J., GOODMAN, & ARMSTRONG, JJ.

*Trust,* Constructive trust.  *Fiduciary.    Limitations, Statute of.*
*Laches.   Evidence,* Declaration of trust, Cumulative.

Evidence in a declaratory judgment action amply warranted a find-
ing that a corporation's attorney, who was also the treasurer and
a director of the corporation, had breached his fiduciary duty in
taking title to certain real estate in his own name as trustee of a
real estate trust and that his conduct gave rise to a constructive trust
for the benefit of the corporation; however, the order to convey
the locus to the corporation should have been directed against the
successor trustee rather than against the executrix of the attorney's
estate. [236-238]
Where there was a fraudulent concealment of a cause of action from
the person entitled to bring the action, the period prior to the dis-
covery of the cause was excluded from the limitation period. [238]
In a civil action the defendants were not barred from recovery by
laches where they did not acquiesce in the wrongful acts, there
was no lack of diligence on the defendants' part in seeking a rem-
edy, and no showing that the time element involved in bringing
suit prejudiced the plaintiff. [238]

BILL IN EQUITY filed in the Probate Court for the county
of Nantucket on October 22, 1971.

The suit was heard by *Knight,* J.

*John D. Dwyer* for the plaintiffs.

*Edward T. Bigham, Jr., & Francis J. O'Rourke* for the
defendants.

HALE, C.J.   In this action Lucille Sanguinetti, as suc-
cessor trustee of Windswept Realty Trust, and Grace M.
Henry, as executrix of the will of Roy E. Sanguinetti,
sought a judgment pursuant to G. L. c. 231A declaring (1)

---

[1] W. Marland Rounsville.

the former to be the owner of certain realty and (2) that the estate of Roy E. Sanguinetti is not subject to any claim of the defendants. After a trial a judge of probate entered an order for judgment under which the executrix was directed to convey that realty to the defendants, subject to certain reimbursements. The plaintiffs have appealed from that order. As no judgment was entered pursuant to that order, the case is not properly before us, but inasmuch as all of the issues have been argued and it is highly unlikely that a judgment at variance with that order would have been entered, we have chosen to deal with the issues raised by this "appeal," (see *Nantucket Land Council, Inc.* v. *Planning Bd. of Nantucket, ante,* 206, 207-208 [1977]) and we have determined that there was no error.

We have before us the judge's "Statement of Proceedings," "Findings of Fact," "Conclusions of Law" and "Order for Judgment." We also have designated portions of the transcript and the exhibits. In these circumstances in reviewing the trial judge's ultimate conclusions, which are drawn from his subsidiary findings of fact, it is our duty to draw our own inferences and reach our own conclusions. *Jones* v. *Gingras,* 3 Mass. App. Ct. 393, 395-396 (1975). *Blakeley* v. *Pilgrim Packing Co.* 4 Mass. App. Ct. 19, 23 (1976). We may make our own findings of fact where the judge made none. *Bartevian* v. *Cullen,* 369 Mass. 819, 820, n.1 (1976). *Taylor* v. *Lassell,* 4 Mass. App. Ct. 539, 540 (1976). However, his findings shall not be set aside unless clearly erroneous, and due regard will be given to the opportunity of the trial judge to judge the credibility of the witnesses. *Marlow* v. *New Bedford,* 369 Mass. 501, 508 (1976). *Zuckerman* v. *Blakeley,* 3 Mass. App. Ct. 685, 686-687 (1975). Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). The standard we employ to determine whether a finding is clearly erroneous is "when although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.* 333 U. S. 364, 395 (1948). See *Building Inspector of Lancaster*

v. *Sanderson*, 372 Mass. 157, 159-160 (1977); *Sher* v. *Malden Taxi, Inc.* 4 Mass. App. Ct. 404, 411 (1976).

We summarize portions of the detailed and extensive findings of the judge supplemented by our own. Nantucket Construction Company, Inc. (NCC), a road construction firm, was formed in 1946 by the defendant Rounsville, a Mrs. Ellen Ring (the mother-in-law of Mr. Sanguinetti), and one Ashley. Mrs. Ring later remarried and became Mrs. Winters. Ashley died in 1950, and NCC purchased the Ashley stock from his estate, leaving Rounsville and Mrs. Winters each as owner of one half of the outstanding capital stock of NCC. The corporate officers were Rounsville as president, Winters as clerk, and Mr. Sanguinetti as treasurer, with all three as directors. Mr. Sanguinetti was also the corporation's attorney.

In 1946 Rounsville and two partners, Williams and Killen, formed Windswept Cranberries, Inc., which purchased the property that is the subject of this action for $48,000. A mortgage securing the payment of $22,500 was given to Williams. The property (locus) is located in the Polpis section of Nantucket and contains about 510 acres of land, the title to which had been registered.

In 1950 title to the locus was transferred to Williams because of the inability of Windswept Cranberries, Inc., to meet the mortgage payments due to unprofitable cranberry operations. Williams died in 1954. His wife and a Connecticut bank became the executors and trustees under his will. Rounsville decided to buy the locus for NCC and operate the cranberry business as a sideline. In 1955, a lease-purchase agreement was negotiated by Rounsville with one Shepherd, the attorney for the Williams estate. The draft of the agreement, in form between the estate and Rounsville, was submitted to Sanguinetti. It provided for a $50,000 purchase price, payable in annual installments, with NCC paying Williams $1,000 as a deposit. The agreement was signed in Sanguinetti's law office and was kept by him. NCC thereupon commenced maintenance and operation of the cranberry bogs. It made some of the payments required under the agreement and paid

the real estate taxes as well. The corporation expended large sums of money from its funds in maintaining and operating the cranberry bogs but met with little success in the operation.

In 1961 Mr. Shepherd, who had married the former Mrs. Williams and was acting as her attorney in her capacity as the sole trustee of the Williams estate (the bank having resigned as cotrustee), contacted Rounsville and offered to sell the locus for a cash price of $30,000 as a compromise figure to resolve a problem arising out of NCC's delinquency under the 1955 agreement. Rounsville told Sanguinetti of the offer and of his desire to purchase the locus because of its value, and Sanguinetti advised him that the locus should be purchased. Purchase arrangements were subsequently completed in Sanguinetti's office by Shepherd, Rounsville and Sanguinetti, with the last acting as attorney for Rounsville. Sanguinetti drew up a handwritten memorandum of agreement which was initialed by the parties. On December 22, 1961, Rounsville sent NCC's check for $6,000 to Shepherd and promised to pay the balance of $24,000 by February 28, 1962. Sanguinetti advised Rounsville that for tax purposes the $6,000 payment should be listed on NCC's books as interest.

Rounsville asked Sanguinetti to arrange for a bank loan for the purchase money. Sanguinetti, who was a trustee and a conveyancer for and general counsel of Nantucket Institution for Savings, indicated that in view of his influence there would be no problem in obtaining a mortgage for Rounsville. Subsequently Sanguinetti informed Rounsville that the bank had agreed to a loan of $18,000 (60% of the sales price), which left $6,000 more to be raised. In obtaining the $18,000 mortgage loan Sanguinetti had submitted an application in his own name. Subsequently that application was altered by a bank employee who added the words, "as trustee for Lee Holmes and Shedden Sanguinetti." No trust instrument was given to the bank. (There was no evidence before the judge as to who authorized the addition of the quoted language.)

Rounsville had planned to use the proceeds from the

cranberry harvest to pay the balance of $6,000, but those proceeds proved to be insufficient. Rounsville requested Sanguinetti's help in raising the $6,000, and Sanguinetti told Rounsville, "Don't worry about it. I'll take care of it." Later Sanguinetti informed Rounsville that he had raised the additional $6,000 by a stock collateral loan with the bank. A deed to the locus was prepared by Sanguinetti and sent to the Shepherds for signing. The deed was signed by Mrs. Shepherd as trustee, and Mr. Shepherd returned it to Sanguinetti. Mr. Shepherd did not note the name of the grantee in the deed, but both he and his wife at all times considered Rounsville to be the buyer. The deed was approved for registration by the Land Court in the name of Roy E. Sanguinetti, individually, without any other designation.[2] The mortgage and promissory note for $18,000 were prepared by Sanguinetti. The note stated that the maker was Roy E. Sanguinetti under a declaration of trust dated March 1, 1962, but did not name the beneficiaries of the trust. The mortgage given to the bank, however, named as mortgagor "Roy E. Sanguinetti, trustee for Lee Holmes, et al."

On March 19 Sanguinetti registered the deed and the mortgage. The grantee in the deed and in transfer certificate of title No. 4666 filed with the registry district of Nantucket County in registration book 23 at page 106 appeared as "Roy E. Sanguinetti, of ... Trustee under Declaration of Trust dated March 1, 1962, with full power to sell, mortgage and convey the same ...." The registry cash book had entries showing the payment of registration fees for each of those instruments. There was no entry for

---

[2] The deed was sent to the chief title examiner of the Land Court under cover of a letter which stated, "I enclose deed from Enid V. Shepherd, Trustee, to me, Certificate of Title No. 4245 and abstract of the probate of the Estate of Eric J. Williams, and shall appreciate it if the deed can be approved for recording and returned to me as soon as possible." The deed was returned by the chief title examiner under cover of a letter dated March 14, 1962, which stated, "Enclosed herewith please find, approved for registration, a deed given by Enid V. Shepherd, Trustee, under the will of Eric J. Williams, to Roy E. Sanguinetti, dated March 8, 1962, together with Owner's Duplicate Certificate No. 4245."

the registration of a trust instrument on either the March 19, 1962, daily sheet or in the index in the registry, and there was no entry of a registration fee for a trust instrument in the cash book on that date. There was no statement in the deed indicating that the trust instrument referred to had previously been registered or that it was to be registered simultaneously with the deed.

The judge found that a signed copy of a declaration of trust dated March 1, 1962, known as the Windswept Realty Trust, in which Roy E. Sanguinetti was named as trustee for the benefit of Lee Holmes and others "is presently attached to the deed by staples, but ... [that the trust instrument] does not bear the stamped approval of the Land Court examiner, as does the deed."[3] The blue backer on the trust instrument attached to the deed as on file in the registry had the number 8536 handwritten on it. That number was the same as the document number assigned to and stamped on the deed. It was the practice at the Nantucket Registry at all times material to this issue to accord different numbers to a deed and to each of the other documents registered in connection with it. The deed to Sanguinetti, the mortgage application, the trust instrument and its backer were all typed on the same typewriter. The number 8536 written on the blue backer on the trust instrument was in the handwriting of Sanguinetti. The judge found that the document number was placed on the backer by Sanguinetti in an attempt to establish a false registration of the declaration of trust. Because of the informal operation of the local registry of deeds, Sanguinetti had free access to it, even at hours or on days when the registry was closed. He had a key to the door of the registry and the combination to the safe which contained all registered documents.

---

[3] The mortgage, which is an exhibit before us, also bears no indication of approval by the chief title examiner of the Land Court. We take notice that the mortgage could not properly have been accepted for registration without such approval. That approval would not have been given without the trust declaration's having been furnished to the chief title examiner.

On March 19, 1962, Sanguinetti wrote Mr. Shepherd, informed him of the completion of the sale, and thanked him for his patience with NCC in the matter. Subsequently, at Sanguinetti's request, Rounsville paid Sanguinetti $17.75 by check drawn on NCC's account for the registration fees for the deed and the mortgage. Sanguinetti instructed Rounsville to make payments on the taxes, the insurance, and on the two passbooks issued by the bank (one for the $18,000 mortgage and one for the $6,000 stock collateral loan obtained by Sanguinetti). The mortgage payment book listed the mortgagor as "Roy E. Sanguinetti — Trustee." Rounsville believed that Sanguinetti was holding title as trustee for the benefit of NCC and no one else. All payments of the mortgage, taxes and insurance from 1962 through 1968 were paid by Rounsville as treasurer of NCC. NCC made an initial payment on the $6,000 collateral loan, but in 1964 Sanguinetti took possession of that passbook, and no further payments were made by NCC. Rounsville thought that Sanguinetti would be reimbursed when the locus was sold.

Although Sanguinetti resigned as a director and the treasurer of NCC on January 30, 1963, he remained as attorney for Rounsville personally and for the corporation until his death in 1970. The stock book, minutes of the meetings of the directors and stockholders, and the NCC corporate seal were kept in Sanguinetti's law office throughout this period.

The cranberry business and the road construction business were creating heavy losses for NCC, and by the summer of 1963 NCC's financial condition was very poor. Rounsville prevailed upon a friend, one Fowlkes, to grant a loan of $30,000 to NCC. Rounsville and Fowlkes left the terms of the loan to Sanguinetti, who acted as attorney for all of the parties. Sanguinetti offered Fowlkes a "package deal" as security for the loan, under which Fowlkes was to receive sixty per cent of the stock of NCC plus a mortgage on all of the real and personal property of NCC. Fowlkes believed, and was given no reason to think otherwise, that the mortgage covered the "bog property" and that NCC

was the owner of that property. Sanguinetti prepared the mortgage and the note, which were executed by Rounsville as treasurer of NCC.[4] The $30,000 loan proceeds were turned over to Sanguinetti, who paid off the creditors, including two payments to the bank on the $6,000 personal loan that Sanguinetti had obtained in 1962. Sanguinetti was paid $916.72 for legal services and expenses on behalf of the parties in this transaction. Fowlkes never received the stock certificate, the mortgage or the note from Sanguinetti despite the latter's assurances that he would turn them over to him.

Sometime during the period from 1963 to 1965 Sanguinetti asked Rounsville to sign an instrument which would place the title to the locus in equal shares in Sanguinetti, Rounsville and Mrs. Winters. Rounsville refused to sign because he considered that NCC owned the bogs, and it would not be "legitimate" to divide title to the bogs as Sanguinetti requested. The matter was pursued no further. In 1965 Sanguinetti told Rounsville that he had received an offer from one Beinecke to buy the land for $285,000. They agreed that it would be more sensible, in view of the rising value of the real estate, to wait until the mortgage had been paid.

On December 3, 1968, Rounsville's wife ordered Sanguinetti's son off the cranberry bogs because he was hunting deer in an area that Rounsville had posted prohibiting hunting or trespassing. Sanguinetti called Rounsville and heatedly said, "You have lost the property, I own it, I'll get someone else to run it." Rounsville discounted the remarks as he knew Sanguinetti to be a sick man (suffering from chronic leukemia). Rounsville also believed that it was Sanguinetti's "prerogative as trustee to handle the

---

[4] We note from the exhibits that (1) by vote of the stockholders of NCC the $30,000 put into the company by Fowlkes was "to be secured by a mortgage on all real and personal property of the corporation, and, in addition, that he become the owner of the corporation to the extent of sixty (60) per cent of the outstanding stock"; and (2) the mortgage was of approximately ten acres of land, apparently unrelated to the 510 acres that made up the locus (which included the bogs).

property as he saw fit." On December 4, 1968, Sanguinetti sent Rounsville an eviction letter and requested that all NCC equipment be removed from the locus. Also on that date Sanguinetti instructed the bank to send all notices of payments on the mortgage to him in his capacity as legal owner of the property.

The next day Rounsville met with Sanguinetti and had a pleasant discussion in which there was no mention of what had taken place on the two preceding days. Sanguinetti appeared "to be his old self" and was very friendly. He suggested that "the bogs" be rented to Rounsville personally for a five-year term at $1,200 a year beginning November 1, 1969. A lease was prepared by Sanguinetti in which Sanguinetti as trustee under a declaration of trust dated March 1, 1962, was the lessor and Rounsville was the lessee. The lease was executed on the following day. It contained a clause which provided that in the event of a sale of the property Sanguinetti would pay Rounsville fifteen per cent of the selling price. Rounsville believed this to be a bonus to him for his work on the bogs and that Sanguinetti as trustee had the authority to make this arrangement. The lease also contained the words, "This agreement shall also constitute a general release of all claims and demands as between the above-named parties." The agreement was retained by Sanguinetti, and no copy of it was furnished to Rounsville.

NCC continued to operate the bogs after execution of the lease agreement, but at a loss. From 1957 to 1973 NCC had put over $100,000 of corporate funds into the operation of the property and after 1968 Rounsville put $50,000 of his own funds in NCC to keep it going. Neither NCC nor Rounsville made any rental payments to Sanguinetti as no bills were ever received. However, after December 6, 1968, neither NCC nor Rounsville made any further payments on the mortgage, the taxes, the insurance, or the collateral loan due to the poor financial condition of the corporation; NCC was unable to pay its 1968 to 1970 withholding and social security taxes. Rounsville apparently believed that Sanguinetti was content to be reim-

bursed for all his payments made on the mortgage and other obligations at the time of the final disposition of the locus. Therefore neither Rounsville nor NCC increased the mortgage on the locus or attempted to sell the property despite NCC's poor financial situation.

NCC never listed a beneficial interest in the locus on its corporate tax returns, on its annual certificates of condition, or on any of its records, public or private. Payments of principal and interest on the bank loans were listed on the 1961 through 1967 tax returns as "rent" as a result of the legal advice given by Sanguinetti. However, Sanguinetti, as trustee of Windswept Realty Trust, did not report any rental income or loss from either NCC or Rounsville on his fiduciary income tax returns for any of the years 1962 through 1969.

Sanguinetti died in June, 1970. In the fall of that year Rounsville was contacted by Lucille Sanguinetti, widow of Roy, and a Mr. Holmes, her attorney. A meeting was held to discuss the bogs, and Rounsville suggested that money owed under the December, 1968, lease be spent on improving the condition of the bogs. This arrangement apparently met with Mrs. Sanguinetti's approval. However, the executrix of Sanguinetti's will sent Rounsville an eviction notice dated December 17, 1970. After receiving the notice and talking with members of the Sanguinetti family, Rounsville became suspicious that the trust arrangement was not as he believed it to be and thereupon obtained counsel.

The judge found, among other things, that by breaching his fiduciary duty and taking advantage of his position, Sanguinetti wrongfully took title to the locus in his name as "Trustee for Lee Holmes, et al" with the intent to defraud Rounsville and NCC. He ruled that the conduct of Sanguinetti in purchasing the locus in 1962, as it related to his client, NCC, gave rise to a constructive trust for the benefit of NCC.

1. A constructive trust is imposed in order to avoid the unjust enrichment of one party at the expense of another where the legal title to the property is obtained (a) by

fraud, (b) in violation of a fiduciary relationship, or (c) where information confidentially given or acquired is used to the advantage of the recipient at the expense of the one who disclosed the information. *Barry* v. *Covich*, 332 Mass. 338, 342 (1955). *Kelly* v. *Kelly*, 358 Mass. 154, 156 (1970). *Coelho* v. *Coelho*, 2 Mass. App. Ct. 433, 435 (1974).

We have recounted above a number of facts found by the judge. These and other findings of the judge were warranted on the evidence and formed an ample basis for his ruling imposing a constructive trust for the benefit of NCC. However, as transfer certificate of title No. 4666 was issued to Sanguinetti as trustee under a declaration of trust dated March 1, 1962, and, as the only trust which is shown to meet that description is Windswept Realty Trust, the judge necessarily imposed the constructive trust for the benefit of NCC against Sanguinetti in that capacity. As Lucille Sanguinetti now holds the record legal title to the locus as Sanguinetti's successor trustee, it is she, rather than the executrix under Sanguinetti's will, who is the constructive trustee. Therefore, the order to convey the locus to NCC should have been directed against Lucille Sanguinetti as successor trustee rather than against the executrix. We conclude that to be the intent of the judge.

Furthermore, Sanguinetti was in positions of trust, not only as the treasurer and a director of and the attorney for NCC, but also as Rounsville's personal attorney. In such positions it was incumbent on Sanguinetti to show "that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved. . . . The attorney must see to it that his client is so placed as to be enabled to deal with him at arm's length, without being swayed by the relation of trust and confidence which exists between them." *Hill* v. *Hall*, 191 Mass. 253, 262 (1906).

The evidence demonstrates, and the judge found, that Sanguinetti failed, through acts and omissions, properly to discharge the duties that he owed his client.

As we have concluded that the imposition of a constructive trust was proper, we need not discuss the judge's further finding that a resulting trust was also established on the evidence.

2. The claim of NCC was not barred by the statute of limitations. The evidence warranted the finding that Rounsville did not have actual knowledge that the beneficiaries of the trust might be persons other than NCC until 1970. Where, as in this case, there has been a fraudulent concealment of the cause of action from the person who was entitled to bring the action, the period prior to the discovery of the cause is excluded from the limitation period.[5] G. L. c. 260, § 12. Compare *Radford* v. *Lovett*, 1 Mass. App. Ct. 874 (1974).

3. We agree with the judge that the defense of laches is not a bar to recovery in this case, even assuming that the defendants were aware of Sanguinetti's adverse interest as early as December of 1968. There appears to have been no acquiescence by the defendants in the wrongful acts of Sanguinetti, no lack of diligence on their part in seeking a remedy, and no positive showing that the time element involved in bringing suit operated to prejudice the plaintiffs. *Erickson* v. *Waltham*, 2 Mass. App. Ct. 436, 450-451 (1974). *Blakeley* v. *Pilgrim Packing Co.* 4 Mass. App. Ct. 19, 23 (1976). In addition, the determination of laches is generally one of fact requiring consideration of all the circumstances attendant on delay in bringing the suit in equity. *Shea* v. *Shea*, 296 Mass. 143, 148 (1936).

4. Upon motion of the defendants the judge struck the March 1, 1962, declaration of trust (which had been admitted de bene) from evidence as it "was not in fact duly

---

[5] The case was tried and has been argued on the assumption that G. L. c. 260, § 2, is the governing statute. It is unnecessary for us to determine what period applies, as on the judge's findings the action was brought within the two-year limitation found in G. L. c. 260, § 2A, as appearing in St. 1948, c. 274, § 2.

recorded with the Nantucket Land Registration Office."
It was error for the judge to have done so. However, that
error was harmless at best, as the contents of the trust
document were unimportant to the resolution of the issues
in the case. The existence of the trust document itself and
the circumstances surrounding its attempted registration
were relevant, and evidence as to those matters and the
beneficiaries under the trust appears throughout the rec-
ord; and that evidence was at no time excluded or struck.
Moreover, the judge made numerous findings based on
that evidence, including findings which recognized the
existence of the trust.

We have carefully reviewed the plaintiffs' other claims
of error and find them to be without merit.

The order for judgment should be modified by striking
the words "Grace M. Henry, executrix of the estate of
Roy E. Sanguinetti, is ordered to effectuate a conveyance
of the subject property from said estate" and inserting in
place thereof the following: "Lucille Sanguinetti as suc-
cessor trustee of Windswept Realty Trust is ordered to
make conveyance of the real estate described in transfer
certificate of title No. 4666 filed in the registry district of
Nantucket County registration book 23 at page 106." Judg-
ment should be entered pursuant to the order as so
modified.

*Appeal dismissed.*