# United States Court of Appeals
## For the First Circuit

No. 02-1804

LEON SCHARA,

Plaintiff, Appellee,

v.

COMMERCIAL ENVELOPE MANUFACTURING CO., INC.,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Frank H. Freedman, Senior U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Lynch, Circuit Judges.

Jack F. St. Clair, with whom Charles K. Bergin, Jr. was on brief for appellee.

John W. McConnell, with whom Wachtel & Masyr, LLP was on brief for appellant.

February 28, 2003

**LYNCH**, <u>**Circuit Judge**</u>.  Leon Schara sued his former employer, Commercial Envelope, in federal court for bonuses not paid to him during his three years' employment there.  Schara alleged that his original employment contract had provided for a one percent bonus on non-house accounts only, and that this agreement was subsequently revised, following Commercial's failure to obtain life insurance for him, to a bonus on all accounts.  Commercial responded that neither the original agreement nor the revised agreement had ever been signed by Commercial, and so no agreement existed.  Commercial  requested that the judge deliver a jury instruction on the Statute of Frauds; the judge refused, saying he had ruled the Statute inapplicable but he did not give his reasons for that conclusion.  The jury found for Schara, awarding him damages of over $220,000, equivalent to a bonus on all of the accounts.  Commercial now appeals the judge's refusal to submit the issue to the jury, and to deliver a jury instruction on the Statute.  We affirm.

I.

In 1995, Leon Schara was 58 years old and had undergone quintuple heart bypass surgery.  He had worked at Westvaco Company, an envelope manufacturing company, for 23 years and was their national sales manager for national and wholesale accounts.  In March of that year, Ira Kristel, Chairman of Commercial Envelope,

another envelope manufacturer, approached Schara about taking a job as National Sales Director.

Schara was interested, but told Ira Kristel that he had "had a couple of heart attacks, . . . five bypasses, and . . . two stents put in." As a result, he wanted a half million dollar life insurance policy "because I don't expect to outlive my wife." (At Westvaco, he had a life insurance policy of around $330,000.) During the course of negotiations, according to Schara, Ira Kristel personally assured him that Commercial would get him life insurance. Ira Kristel also promised him a bonus of one percent of the increase in sales, excluding "house" accounts -- a specified list of sales accounts which predated Schara's arrival. He also assured Schara's wife that Schara would receive life insurance.

On June 23, 1995, Commercial's external counsel, Steve Cohen, forwarded an employment agreement to Schara for his signature. Cohen did so at Steven Kristel's instruction, after Steven Kristel had reviewed the contract. Steven Kristel is Ira's son and Vice President of Commercial. In his cover letter, Cohen described the agreement as "final" and asked Schara to "return both contracts signed by yourself to Ira Kristel." That agreement called for Commercial to take out life insurance for Schara in the amount of $500,000. It also provided for a one percent bonus on all business, above the base level set in 1995, excluding designated house accounts. One provision of the contract provided

for a severance payment in the event that more than half of Commercial was sold and Commercial was unable to perform as a result. This pay-out would take place over a two-year period.

The cover letter said that the list of house accounts would be provided to Schara directly by Commercial. The appendix listing house accounts was blank, however, according to Schara. He said he asked Ira Kristel about the blank page, and was told "Sign it. It's in your favor." Schara signed the contract and returned it to Ira Kristel; he never received a copy signed by Ira Kristel. Schara testified that when he called Ira Kristel to ask about the contract, he was assured that Kristel had signed the agreement. Subsequently, Schara received a six-page list of house accounts, some time after he began work for Commercial in July 1995.

Because of Schara's medical history, however, Commercial could not obtain life insurance for him. This was apparently discovered after Schara started work for Commercial, although there is some dispute as to the exact timing. Schara testified that he met with Steven Kristel and attorney Wachtel, another lawyer for the Kristels. They agreed that, in lieu of life insurance, Schara would receive a bonus based on all of Commercial's accounts, including house accounts.

On November 29, 1995 attorney Cohen faxed a revised employment contract to Schara for his signature. The cover letter

stated, "At the request of Steven Kristel, I have revised your employment agreement by deleting Section (d) to Appendix B." Section (d) referred to the $500,000 life insurance provision. Schara signed the contract and returned it to Commercial; he never received a copy signed by either Kristel.

Schara also testified that he spoke with Steven Kristel on April 5, 1996. He produced notes in his handwriting from that conversation, reading "4/15/96, revision per Steven Kristel. He'll send me a copy of the revised contract to include these changes, no house accounts in exchange for five hundred thousand dollar life insurance policy."

During the three years Schara worked at Commercial Envelope its sales grew by approximately $11 million dollars, from $36 million dollars to $47 million dollars. Throughout this period, Schara received his full salary, health insurance, use of a company car, and paid membership in a country club, as he was entitled under both written and oral assurances from Commercial. The bonus is the only disputed aspect of his compensation. Schara did not make a written demand for his bonuses at any time. Schara testified that he had made oral demands, but that they were ignored by the Kristels. He said he was afraid to press his claims while he was still employed at Commercial for fear that they would lead to litigation and retaliatory firing. Schara was terminated in

1998, and subsequently brought suit for his unpaid bonuses for all three years of employment.

A jury trial was held in May 2002. At trial, Ira Kristel contended that there was no agreement, that he had never signed anything. During cross-examination, Ira Kristel acknowledged that there was probably "something owed Mr. Schara" for unpaid bonuses. The district court denied Commercial's repeated motions for judgment as a matter of law and a directed verdict on the basis of the Statute of Frauds. It also refused to deliver jury instructions on the Statute of Frauds, ruling from the bench that the Statute did not apply. The jury found in Schara's favor, and awarded him $223,135.39 in damages for the breach, an amount equal to a one-percent bonus on all of Commercial's sales, including house accounts. With interest calculated by the judge, the total judgment was for $311,178,73. Commercial then filed this appeal, protesting the judge's failure to give jury instructions based on the Statute of Frauds.

## II.

Our standard of review for refusal to give a requested jury instruction is de novo. See Gray v. Genlyte Group, Inc., 289 F.3d 128, 133 (1st Cir. 2002).

The Statute of Frauds was originally promulgated in the seventeenth century to protect against the dangers of perjury and uncertain memory inherent in oral testimony. "Thus, the purpose

underlying the statute of frauds is to prevent frauds by assertion of claims not evidenced by a written agreement or by a note or memorandum containing essential terms of the contract between the parties."  61 N.Y. Jurisprudence 2d, Statute of Frauds, §4, at 21 (1987) (footnote omitted).  This dispute is governed by New York law.  The Statute of Frauds, codified in New York, reads in relevant part:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged . . . if such agreement, promise or undertaking ... [b]y its terms is not to be performed within one year from the making thereof . . . .

N.Y. Gen. Oblig. Law § 5-701(a) (Consol. 2002).

Over the past century, there has been a general trend to cut back on the reach of the Statute.  See 2 E.A. Farnsworth, Farnsworth on Contracts § 6.1, at 98 (2d ed. 1998).  The Statute of Frauds has been largely abolished in England since 1954.  Id. at 95.  In the United States, it has been "the subject of constant erosion.  Courts have long been receptive to pleas that the statute should be narrowly interpreted so as not to cover the contract in question."  Id. at 98-99.

This erosion has happened on a number of fronts; one is pertinent here.  New York has consistently chosen to construe the one-year provision of the Statute -- the requirement that contracts not performable within a year fall within the Statute -- narrowly.  "Wherever an agreement has been found to be susceptible of

-7-

fulfillment within that time, in whatever manner and however impractical, this court has held the one-year provision of the Statute to be inapplicable, a writing unnecessary, and the agreement not barred." D&N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 455 (1984). This is usually a matter of interpretation of the contract language by the court, and often resolved on a motion to dismiss. Id.; Cron v. Hargro Fabrics, Inc., 91 N.Y.2d 362, 370 (1998). In any event, there are no issues of fact on this point.

New York courts have found a range of termination provisions sufficient to keep agreements out of the reach of the Statute. See, e.g., Coinmach Inds. Corp. v. Domnitch, 37 N.Y.2d 889, 891 (1975) (where defendant had the option of selling at any time the property on lease to the plaintiff); N. Shore Bottling Co. v. Schmidt & Sons, Inc., 22 N.Y.2d 171, 176-77 (1968) (where defendant had the option to discontinue at any time the activities upon which the agreement was based); Nat Nal Serv. Stations, Inc. v. Wolf, 304 N.Y. 332, 340 (1952) (where agreement merely set the terms of anticipated prospective purchases); Blake v. Voigt, 134 N.Y. 69, 71 (1892) (where either party had the option to terminate within seven months).

Here, the policy concerns which underlie the application of the Statute are not at issue. This is not a situation where Schara's claims are based solely on oral testimony, unsupported by

writings, and subject to the vagaries of memory. Instead, he relies on writings drafted and presented by Commercial. Moreover, the facts surrounding the presentation of those writings -- where each writing was presented by Commercial's attorney, labelled first a "final" agreement and then a "revision" to a final agreement, where Schara followed instructions to sign each and return it, and where Commercial neither signed nor indicated to Schara that it had not signed -- do not incline us to invoke the Statute on Commercial's behalf. Consequently, we interpret the one-year provision narrowly, avoiding use of the Statute to "afford persons a means of evading just obligations." Morris Cohon & Co. v. Russell, 23 N.Y.2d 569, 574 (1969).

The contract provided for payment of salary and a bonus to Schara in the event the company was sold:

> 11. Sale of Business. If at any time during the term hereof more than 50% of the assets or stock of the Company is sold, and if as a result thereof, the Company is unable to perform its obligations hereunder, the Employee shall be entitled to receive the compensation to which he was otherwise entitled hereunder, in addition to severance in an amount equal to 300% of the Bonus, if any, he received for the previous Contract Year. If such sale is consummated during the first Contract Year hereunder, the severance hereunder shall be $500,000. The severance hereunder shall be paid over a period of 24 months in 48 semi-monthly installments.

This provision removes the contract from the ambit of the Statute.

A mere breach of contract within a year would not suffice to remove a contract from the Statute under New York law. As all contracts could be in breach, allowing breaches within a year to

remove an agreement from the Statute would potentially vitiate it. See Ohanian v. Avis Rent A Car Sys., Inc., 779 F.2d 101, 107-08 (2d Cir. 1985). But the contract provision here envisions a termination, not a breach. Likewise, if the termination provision is not set forth explicitly in the contract, the Statute of Frauds will apply. See Paper Corp. v. Schoeller Technical Papers, Inc., 742 F. Supp. 808, 810 (S.D.N.Y. 1990); City of Yonkers v. Otis Elevator Co., 649 F. Supp. 716, 727 n.15 (S.D.N.Y. 1986). Here, however, the termination provision is express.

New York law does not allow termination provisions solely within the control of the plaintiff to remove an agreement from the scope of the one-year provision. But the case at hand does not involve an oral agreement terminable within a year only by the party that seeks to enforce the agreement; instead it is an agreement where the right to terminate within a year is in the hands of the defendant. New York courts have long found such agreements to be outside of the Statute of Frauds. See Huebener v. Kenyon & Eckhardt, Inc., 534 N.Y.S.2d 952, 955 (N.Y. App. Div. 1988).

Commercial argues that the two-year pay-out period envisioned by paragraph 11 suffices to place this contract within the Statute. We disagree. Because "the terms of the contract here ... included an event which might end the contractual relationship of the parties within a year, defendant's possible liability beyond

that time [does] not bring the contract within the statute."  Cron,
91 N.Y.2d at 370 (quoting Martocci v. Greater N.Y. Brewery, Inc.,
301 N.Y. 57, 62 (1950)).

As to the two-year pay-out, Commercial stresses the
importance of the test of the "endurance of defendant's liability."
The language of "enduring liability," however, derives from cases
in which contractual rights persist other than mere pay-out of a
pre-determined severance amount.  See, e.g., Martocci, 301 N.Y. at
62-63 (ongoing obligation to pay commission based on plaintiff's
introduction of defendant to customer); Cohen v. Bartgis Bros. Co.,
289 N.Y. 846, 846-47 (1943) (obligation to pay commissions
outlasting plaintiff's employment with defendant).  The doctrine
does not limit Cron's holding.

Schara advances other arguments as to why the Statute of
Frauds does not apply; because we find for the above reasons that
the contract was not within the one-year provision, we do not
address them here.

The district court is **affirmed**.  Costs to Schara.