DANIEL JUDGE & others[1] *vs.* JOHN H. GALLAGHER & others.[2]

Suffolk.    December 8, 1983. — March 20, 1984.

Present: GRANT, DREBEN, & SMITH, JJ.

*Joint Enterprise.   Fiduciary.   Damages,* Breach of fiduciary duty.

In an action by certain shareholders of a corporation against four other share-
holders who had conducted the negotiations leading to the reacquisition of
the assets of a predecessor corporation from a California corporation to
which they had been sold, evidence warranted a conclusion that the ar-
rangements between the defendants and the plaintiffs in connection with
the reacquisition were sufficiently similar to a joint venture to create a
fiduciary relationship between the defendants and the plaintiffs. [639-642]
In an action by certain shareholders of a corporation against four other share-
holders who had conducted the negotiations leading to the reacquisition of
the assets of a predecessor corporation, the judge, having found that the
defendants had breached their fiduciary duty to the plaintiffs in connec-
tion with the reacquisition, properly awarded damages in an amount mea-
sured by the value of the shares the plaintiffs would have owned but for the
defendants' wrongdoing, including the value of a percentage of the stock
purchased by outside investors, although he should have deducted
amounts the plaintiffs would have paid in purchasing the stock. [642-644]

CIVIL ACTION commenced in the Superior Court on May 24,
1975.

The case was heard by *Goldblatt,* J., a District Court judge
sitting under statutory authority.

*Marshall D. Stein* for the defendants.

*Paul K. Connolly, Jr.* (*Margaret S. Fearey* with him) for the
plaintiffs.

---

[1] Barbara Judge, John Brett, Lawrence Murray, Kathleen Flahive, Thomas
Brett, Kathleen Ryan, Ellen Cahill, Jean Kilroy, executrix of the estate of
Thomas Kilroy, and Mary G. Ryan, executrix of the estate of Dennis Gal-
lagher.

[2] Arthur Pappas, James C. Zaros, Nicholas G. Tagaris, and Datel Systems,
Inc.

DREBEN, J.   After discovering that they did not own ten percent of the outstanding shares in Datel Systems, Inc. (Datel II), as they had been led to believe by the defendants, the plaintiffs sought declaratory and other relief.[3]   Finding a breach of fiduciary duty[4] and fraud, a Superior Court judge awarded the plaintiffs damages in an amount equal to the value of the shares they would have owned but for the defendants' wrongdoing. We affirm the award of damages, except as modified herein.

The facts as found by the trial judge, supplemented by us in minor respects from the evidence, support the conclusion that the arrangements between the defendants and the plaintiffs in connection with the acquisition of Datel II created a fiduciary relationship.   In 1969, at the behest of John H. Gallagher (a defendant and also a nephew of one of the plaintiffs), the plaintiffs invested in a corporation, herein referred to as Datel I, and received approximately ten percent of its stock.   With the consent of the plaintiffs, the assets of Datel I were sold to a California corporation in 1970.   The plaintiffs received ten percent of the shares of the California corporation acquired in exchange for the Datel I assets.   Although the Datel division was successful, the California corporation did not prosper and the value of its stock declined.

In July, 1971, at the prodding and initative of Daniel Judge (a plaintiff and a spokesman for the other plaintiffs), the former stockholders of Datel I, including the defendants, sought legal advice. Informed that they had a viable claim of misrepresentation[5] against the California corporation which could lead to rescission of the Datel I sale, the plaintiffs and the defendants agreed to share legal expenses in proportion to their respective ownerships of shares in the California corporation and to hold the shares of the reacquired Datel division in the same proportions.

---

[3] We here refer, as did the parties, to the figure of ten percent, although the actual percentage is 9.78, and damages were awarded on the correct basis.

[4] The judge did not state on what grounds he found a fiduciary duty. The plaintiffs tried the case on a theory of joint venture.

[5] The misrepresentations related to sales, earnings, and assets of the California corporation.

After Judge and the defendants met with another lawyer, John Gallagher telephoned Judge in August, 1971, and informed him that he and another defendant were flying to California to confront the president of the California corporation with the misrepresentations. Judge offered to go with them, but his offer was apparently declined.

Thereafter, the defendants negotiated with the California corporation, keeping Judge informed of their progress. On October 12, 1971, a memorandum of agreement was signed by the California corporation as seller of the Datel division and by the four individual defendants as buyers. John Gallagher notified Judge that an agreement had been reached and that the plaintiffs would have the same percentages of ownership in the new company (Datel II) as they had had in Datel I and in the California company. While Judge was not informed of the financing details of the October 12, 1971, agreement or of a December agreement which superseded it, he was told that Datel II would finance the purchase in part by issuing stock to the selling corporation and by borrowing from a bank. When he again offered to pay legal expenses, he was told that the legal expenses would be paid by the new company and thus borne by the plaintiffs and defendants in proportion to their respective stock ownerships.

In August, 1973, the plaintiffs received a financial report from which they learned for the first time that they did not own ten percent of Datel II and that the purchase had been effected in a manner different from what had been represented to them. Although the plaintiffs had received shares in October, 1971, the report disclosed that those shares did not represent ten percent of the stock originally issued by Datel II but only slightly more than five percent. The report also showed that there had been a sale (to outsiders) of 140,000 shares of preferred and common stock which further diluted the plaintiffs' holdings and that the four defendants had acquired for themselves individually all the shares which had been issued to the California company at the time of purchase. After negotiations with the defendants failed, the plaintiffs instituted the present action.

The judge found that the defendants had violated their fiduciary duties to the plaintiffs in three ways. (1) Instead of

issuing ten percent of the stock of Datel II to the plaintiffs, the defendants issued only slightly more than five percent. (2) The defendants never informed the plaintiffs of the sale of stock to outside investors and did not permit them to participate in that opportunity. The judge found that the price at which the stock was sold was below fair market value and that at the time the money was raised from outsiders for the purchase of the Datel division defendant John Gallagher was seeking funds from the plaintiffs for investment in another venture. (3) By obtaining and exercising the option to repurchase the shares issued to the California corporation solely for themselves, the defendants wrongfully deprived the plaintiffs of their proportionate rights to reacquire those shares. The judge also found that Datel II voted the defendants salary increases in 1972 to help them exercise the option.

To make the plaintiffs whole the judge ruled that the plaintiffs were entitled to 9.78 percent (see note 3, *supra*) of the outstanding shares of Datel II as of the time when they discovered from the financial report that they had been shortchanged.[6]

1. *Existence of a fiduciary duty.* In challenging the judge's ruling that the defendants owed the plaintiffs a fiduciary duty to allow them to participate fully in the acquisition of the Datel division from the California company, the defendants attempt to distinguish between the goal of rescinding the sale of Datel I and the actual purchase of the assets of the Datel division to form Datel II. While they concede that perhaps a joint venture could be found as to the former, they argue that the transaction evolved solely into an undertaking of the defendants to purchase the division with outside investors. In this venture, they claim the plaintiffs had no right to participate.

We, as did the judge, conclude otherwise. While the initial efforts to regain Datel I emphasized litigation and rescission, the judge found that Judge agreed on behalf of the plaintiffs "to

---

[6] It appears that Datel II was sold at a great profit in 1979, and that a portion of the proceeds were put in escrow to allow the sale to go through despite the plaintiffs' claims. The judgment here at issue awarded the plaintiffs $1,023,078, an amount which represents the proceeds of the additional shares to which the judge held they were entitled.

the pursuit of the reacquisition of Datel through any means, including negotiations'' on the basis of the plaintiffs' contributing ''their proportionate share of the legal fees and other expenses.'' That finding is not clearly erroneous. Indeed, not only was negotiation considered very early on in preference to litigation, but after their first trip to California in August, the defendants came back with a written proposal from the California corporation which recognized that it was negotiating with *all* the former stockholders of Datel I, including the plaintiffs.

The defendants also urge that the elements of a joint venture do not exist as to the reacquisition of Datel. More particularly, the defendants claim that there was no understanding that the plaintiffs would have any control over the negotiations, that the costs of acquisition and the risks of loss were not shared by the plaintiffs, who had neither control over, nor exposure to, potential losses, and that the terms of the purchase from the California corporation were too indefinite for there to have been a joint venture contract. We find none of these claims persuasive.

a. *Right to control.* While the ''right to participate in the control or management of the enterprise'' is important, and may even be an essential element of a ''textbook joint venture,'' *Shain Investment Co.* v. *Cohen,* 15 Mass. App. Ct. 4, 9, 10-11 (1982), the evidence bears out the conclusion that Judge ''was more than a spectator in the enterprise.'' *Id.* at 10. He took a leading role in initiating the move to rescind the sale to the California corporation, sought out lawyers to determine whether the stockholders of Datel I had a valid claim, participated in early strategy sessions, offered to accompany Gallagher on the first California trip, and was informed of the progress and success of the defendants' efforts. The fact that the plaintiffs entrusted the negotiations to Gallagher and the other defendants and took a more passive role than they had at first does not preclude the finding of a joint venture or at least an arrangement ''sufficiently similar to such an endeavor to create a fiduciary relationship between [the defendants] and the plaintiffs.'' *Id.* at 11. See *Shell Oil Co.* v. *Prestidge,* 249 F.2d 413, 417 (9th Cir. 1957); *Kleinschmidt* v. *United States,* 146 F. Supp. 253, 256 (D. Mass. 1956). Cf. *Air Technology Corp.* v. *General Elec. Co.,* 347 Mass. 613, 625 nn. 15 & 16 (1964).

In addition, there is no question that the cooperation of the plaintiffs was essential to the success of the defendants' negotiations with the California corporation and, to that extent, the plaintiffs had some measure of control over the transaction. See *Payton* v. *Abbott Labs,* 512 F. Supp. 1031, 1036 (D. Mass. 1981). Accepting the representation of the defendants as to their percentage interest in Datel II, the plaintiffs did not contest the sale of the Datel division assets, nor did they assert their claims of misrepresentation against the California corporation.

b. *Costs of acquisition and exposure to losses.* The judge found that the parties agreed to share their profits (ownership in the reacquired Datel) and that the plaintiffs "would contribute their proportionate share of the legal fees and other expenses incurred in the reacquisition of Datel I." The defendants claim that the plaintiffs did not share proportionately in the risk of loss. For example they, unlike the defendants, did not guarantee a part of the loan from a bank,[7] proceeds of which were used to pay part of the purchase price.

That claim misses the point. Certainly, joint venturers usually have a duty to share in losses. See *Shain Investment Co.* v. *Cohen,* 15 Mass. App. Ct. at 9. Here, however, the defendants unilaterally attempted to change the relationship and to eliminate the plaintiffs from the acquisition. See *Wilson* v. *Jennings,* 344 Mass. 608, 615 (1962). The defendants had a duty to disclose to the plaintiffs all relevant information and to see whether the plaintiffs were willing to bear their share of the risk. They cannot now complain that the plaintiffs did not share in costs of which they were not made aware. That the plaintiffs were financially able to share in the burdens of reacquiring the company is shown by the fact that John Gallagher was seeking funds from the plaintiffs for investment in another venture at that time.

In sum, we think the important elements of a joint venture or a sufficiently similar arrangement were present. The parties agreed to rescind the Datel I sale or negotiate for its return, they were to share proportionately in the legal and other expenses,

---

[7] There was evidence that each defendant signed a guaranty for $12,500.

and they were to receive proportionate interests in the new company with the expectation of sharing profits. As we indicated earlier, the fact that the plaintiffs entrusted the negotiations to the defendants is not conclusive and, in any event, the plaintiffs had some degree of control. These factors meet the ''pragmatic check list'' of considerations favoring a joint venture set forth in *Shain Investment Co.* v. *Cohen,* 15 Mass. App. Ct. at 9,[8] and, in our opinion, created a fiduciary relationship which imposed on the defendants both a duty of disclosure and an obligation to afford the plaintiffs an opportunity to participate fully in the venture. ''The evidence justified the conclusion that the relationship was to be one of trust and confidence.'' *Wilson* v. *Jennings,* 344 Mass. at 615.

c. *Indefiniteness of terms of purchase.* The fact that the terms of acquisition from the California corporation were not definite at the outset is not significant. What is important is that the terms of the relationship between the plaintiffs and the defendants were sufficiently defined. Cf. *Air Technology Corp.* v. *General Elec. Co.,* 347 Mass. at 626-627.

2. *Damages.* The defendants contend that the judge made numerous errors in the assessment of damages. First, they urge that the plaintiffs are only entitled to ten percent of the value of the stock as of December, 1971, when the Datel division was acquired. The plaintiffs are not, they claim, entitled to share in the benefits derived from the defendants' adroit management occurring after the alleged breach. The defendants misperceive

---

[8] While pointing out that it may not be possible to identify all the criteria for the existence of a joint venture, this court in *Shain* suggested the following ''pragmatic check list'' of considerations which may bear on the question: ''(1) an agreement by the parties manifesting their intention to associate for joint profit not amounting to a partnership or a corporation; (2) a contribution of money, property, effort, knowledge, skill, or other assets to a common undertaking; (3) a joint property interest in all or parts of the subject matter of the venture; (4) a right to participate in the control or management of the enterprise; (5) an expectation of profit; (6) a right to share in profits; (7) an express or implied duty to share in losses; and (8) a limitation to a single undertaking (or possibly a small number of enterprises).''

See also *Payton* v. *Abbott Labs,* 512 F. Supp. at 1036 (''hard-and-fast definition'' of joint venture not consonant with the need for equitable relief in a variety of circumstances).

the nature of the plaintiffs' action. The claim is not one for damages for breach of a contract. As pointed out in *Durfee* v. *Durfee & Canning, Inc.,* 323 Mass. 187, 198-199 (1948), quoting from *Guth* v. *Loft, Inc.,* 23 Del. Ch. 255, 270 (1939), the rules imposing a constructive trust rest not upon damage but "upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation." The judge did not err in awarding the plaintiffs the benefit of the shares to which he found them entitled.

The defendants also claim error in awarding the plaintiffs an amount equal to ten percent of the stock purchased by the outside investors. They point to the facts that their own interests were also diluted by reason of this purchase and that without the infusion of capital, the acquisition would not have been possible. They, of course, emphasize that they do not own the outsiders' shares.

In *Sher* v. *Sandler,* 325 Mass. 348 (1950), a case involving duties similar to those owed by a fiduciary, the plaintiff was held entitled to the defendant's shares where recovery of the shares formerly owned by the plaintiff was no longer possible, as those shares were now held by a third person. Requiring the defendant to disgorge his own shares, said the Supreme Judicial Court, "merely restores to [the plaintiff] that of which he was deprived by the fraudulent nondisclosure of the defendant, namely, a one-half ownership in the corporation." *Id.* at 355. See also *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 116 & n.2, 119, 124 (1959). We think the same principle applies here, where the defendants violated their fiduciary duty of informing the plaintiffs of the opportunity to buy the shares sold to outsiders at less than fair market value. The defendants' claim that there is no evidence that the plaintiffs had sufficient assets to help effect the purchase is, as we have previously observed, refuted by Gallagher's solicitations at that time.

The defendants also urge that the judge erred in not offsetting ten percent of the amount paid by the defendants to exercise their stock option and ten percent of the amount paid by the out-

side investors.   While an offset would be appropriate if this amount had been spent, here most of the consideration was recovered.   The stock issued to the California corporation and to the outside investors included common stock having a $.01 par value per share and preferred stock having a par value of $100 a share.   After exercising their option, the defendants recouped all except $700 (the par value of the common stock) of the consideration they had paid through the redemption of the preferred stock.   The defendants are, however, entitled to a deduction of $949, an amount equal to the sum of 9.78 percent of the $700 and the interest paid on the exercise of this option.[9]   The defendants are also entitled to a deduction for the consideration the plaintiffs would have paid had they participated in the sale to outsiders.   Again, since almost the entire consideration was recouped through the redemption of the preferred stock, the only amount to be recouped is $.01 per share, that is, $137.

As the award is sustained on the grounds already discussed, we see no occasion to reach the issue of fraud.   The amount of the judgment is reduced by the sum of $1,086 and, as so modified, is affirmed.

*So ordered.*

---

[9] Under the contract with the California corporation, the defendants were required to pay $200,000, which equalled the original par value of the preferred stock ($199,300) and of the common stock ($700), plus interest on that sum at the rate of six percent per year.   The option was exercised by the defendants in September, 1972, some nine months after the issuance of the shares to the California company.   Interest for nine months would have amounted to $9,000.   (9.78 percent of [$700 + $9000] = $949.)