**MICROMUSE, INC., and Richard Paradies**

v.

**MICROMUSE, PLC., et al.**

No. CIV.A.01–CV–12333–RGS.

United States District Court, D. Massachusetts.

Feb. 17, 2004.

Susan L. Baker, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, Michael I. Begert, McCutchen, Doyle, Brown & Enersen, San Fransico, CA, Peter A. Lagorio, Gilman and Pastor, LLP, Saugus, MA, Deborah Bailey Wells, McCutchen, Doyle, Brown & Enersen, LLP, San Francisco, CA, Plaintiff.

William N. Berkowitz, Bingham McCutchen LLP, Boston, MA, David L. Kelston, Adkins, Kelston, Zavez, PC, Boston, MA, Noah N. Rosmarin, Adkins, Kelston and Zavez, P.C., Boston, MA, Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

STEARNS, District Judge.

On December 27, 2001, Richard Paradies and Micromuse, Inc., brought this Complaint against the Estate of Christopher Dawes (Estate) and the companies that he had created before his death, Micromuse, Ltd. (also known as Micromuse, Plc.), Micromuse USA, Inc., and Micromuse, Inc. (the Micromuse defendants),[1] alleging breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and claims of false designation of origin under the Lanham Act, 15 U.S.C.

---

1. To avoid confusion, plaintiff Micromuse, Inc., which was incorporated by Paradise in Massachusetts, will be referred to as Micro- muse–MA, while the defendant Micromuse, Inc., a Dawes company incorporated in Delaware, will be referred to as Micromuse–DEL.

§ 1125(a), and "cybersquatting" under the 1999 AntiCybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). By way of counterclaim, the Micromuse defendants seek a declaratory judgment confirming their use of the Micromuse mark.

In essence, the dispute involves an alleged promise made by the younger Dawes, ten years before his sudden and unexpected death, to give his older mentor, Paradies, a one-third interest in one of his companies, Micromuse, Ltd. Paradies also alleges that Dawes promised never to do business in the United States using the Micromuse mark. According to Paradies, Dawes failed to keep either promise.

In 1994, Paradies' company, Micromuse–MA, fell on hard times and went out of business. In 1998, the Massachusetts Secretary of State declared Micromuse–MA defunct and ordered the company dissolved. Micromuse, Ltd., meanwhile flourished, establishing an aggressive marketing presence in the United States. In February of 1998, a Micromuse, Ltd. affiliate, Micromuse–DEL, completed a successful public stock offering and became listed on the NASDAQ exchange under the symbol "MUSE." Micromuse USA, Inc., made its first sale in the United States using the Micromuse mark on February 8, 1995. In June of 1995, Micromuse USA, Inc., a Texas subsidiary of Micromuse–DEL, applied to the Patent and Trademark Office (PTO) to register the "MICROMUSE M" mark. The registration was granted on June 10, 1997. The mark has been used continually in the United States by the Micromuse defendants since February of 1995.

Dawes died on March 21, 1999, in a highway accident in Essex, England, the surrounding circumstances of which were widely reported in the media.[2] Paradies learned of Dawes' death and his substantial estate by no later than August of 2000. On July 2, 2001, Paradies revived Micromuse–MA and a week later served a demand letter on the defendants.

On July 15, 2002, the Estate filed a motion to dismiss, arguing that Paradies had failed to make proper service on its registered agent in England. On July 26, 2002, Paradies opposed the motion, arguing that service on the Estate had been perfected, but suggesting that

> if this Court deems that it is still unclear as to whether service has in fact been effected in the U.K. on the Dawes Estate pursuant to the Hague Convention, said motion should still be denied in favor of a Motion to Quash said service, with a reasonable time granted by the Court at its discretion for Plaintiffs to further demonstrate to the Court to its satisfaction that service has been so effected.

On the same day, Paradies filed a motion to enlarge the time to make service under the Hague Convention on Micromuse, Ltd., and Micromuse, PLC. On July 29, 2002, the court denied the motion to dismiss and allowed the motion for an extension of time.

On February 3, 2003, after the completion of discovery, the Estate moved for summary judgment for failure to make proper service. The Estate also asserted as defenses the statute of limitations, the Statute of Frauds, laches, and abandonment of the Micromuse mark. The Micromuse defendants filed summary judgment motions that echo and expand on the arguments of the Estate. On February 24, 2003, the court granted judgment to the Estate, holding that Paradies had failed to perfect service. In so ruling, the court

---

2. At the time of his death, Dawes, who had sold his interest in Micromuse to pursue a career as a hotelier, was facing trial on a significant drug charge.

noted Paradies' failure to rebut the affidavit of Dawes' London-based attorney-executor, Ann–Glaves Smith, attesting that she while had been served with the Complaint, she had not been served with a summons.[3]

On March 5, 2003, Paradies asked the court to reconsider its order dismissing the Estate. Paradies argued that the court had erroneously interpreted his motion for an extension of time to perfect service on the Micromuse defendants as an admission that service had not been perfected on the Estate.[4] On April 3, 2003, the court heard oral argument on the motions for summary judgment and on Paradies' motion to reconsider. On reexamination of the ruling on the Estate's summary judgment motion, it is apparent that Paradies is correct. Consequently, the motion for reconsideration will be *ALLOWED*.[5]

### FACTS

The undisputed facts in the light most favorable to Paradies and Micromuse–MA, as the nonmoving parties, are as follows. In 1981, Paradies, a nine year computer industry veteran, was employed by Lexidata, a Massachusetts-based computer firm. Dawes was studying electrical engineering and working for a Lexidata distributor, Quentron Graphics, in Australia. According to Paradies, between 1981 and 1986, he "tutored, trained, and supported" Dawes on all aspects of Lexidata products and computers, weekly by telephone from the United States and in person while on business trips to Australia.

In 1987, Paradies and his wife Karen incorporated Micromuse–MA to build and market integrated Unix systems. By 1988, Dawes had moved from Australia to London. Dawes expressed an interest in establishing a business relationship with Micromuse–MA. In August of 1989, Dawes visited Paradies at his home in Woburn, Massachusetts. During the visit, Paradies trained Dawes on the Unix system.

At the end of the visit, Paradise and Dawes orally agreed that Dawes would establish a company in the United Kingdom as a "jointly-owned subsidiary" of Micromuse–MA. Dawes' company would act as the "arm" of Micromuse–MA with Europe as its sales territory. Paradies and Micromuse–MA would have the exclusive right to sell products in the United States bearing the Micromuse mark. Paradies and Dawes agreed to defer a decision on the ownership interest Paradies would acquire in Dawes' company until December of 1989.

On November 1, 1989, Dawes changed the name of his United Kingdom corporation from Intervend, Ltd., to Micromuse, Ltd., and ran trade advertisements developed by Micromuse–MA. In November of 1989, Dawes and his then fiancée spent a week with Paradies and his wife Karen at their home in Woburn, Massachusetts. During a telephone call in December of

---

3. Article 5 of the Hague Convention requires service in accordance with the domestic rules of the receiving State. Civ. P.R. 7.8(1) of the English Lord Chancellor's Department requires that a summons be served with the Complaint, similar to Fed.R.Civ.P. 4(a) and 4(c)(1).

4. The misunderstanding was compounded by Paradies' mistaken assumption that the court's denial of the Estate's motion to dismiss was a conclusive ruling that proper service had been made.

5. The Micromuse defendants have filed a motion to strike several of the exhibits that were filed by plaintiffs in opposition to summary judgment and a motion to strike portions of the plaintiffs' reply to defendants' statement of undisputed facts. The motions will be *DENIED*, however, it is the practice of the court to consider only admissible evidence.

1989, Dawes agreed to convey to Micromuse–MA a one-third interest in Micromuse, Ltd. There was no agreement as to when the transfer would occur.

For approximately a year, Dawes bought products from Micromuse–MA and resold them in Europe. Dawes and Paradies spoke regularly about the business. Dawes reported monthly on his sales of Micromuse products. On November 29, 1990, Dawes spoke by telephone with Karen Paradies (then an officer of Micromuse–MA). Dawes told Karen Paradies that he had begun buying UNIX products directly from Micromuse–MA's own supplier at lower cost, and that Micromuse, Ltd., was prospering as a result. According to Karen Paradies' notes of the conversation, Dawes said that Micromuse, Ltd.'s sales for November would exceed $300,000, a figure well in excess of Micromuse–MA's own sales.[6] Paradies acknowledges that his wife informed him of her conversation with Dawes, but maintains that he "discounted" Dawes' optimistic sales projection as an exaggeration. When asked why, Paradies testified as follows.

Q. Did you nevertheless have a positive reaction to the report that generally things were going well with Micro-Muse,[7] Ltd., in the U.K.?

A. I discounted it.

Q. Why?

A. Because he had a way of exaggerating things.

Q. Did you have any reason to believe that any of the statements that he made to Mrs. Paradies were untrue?

A. I had no reason to believe his statements.

Q. Or to disbelieve his statements?

A. Or to disbelieve his statements.

Paradies Deposition, at 278–279. By the end of 1990, Dawes no longer reported sales figures to either Micromuse–MA or to Paradies.

According to Paradies, in early 1991, Dawes called to tell him that "the 386 UNIX business was not profitable, ... and he was going to go into a different business." Paradies Deposition II, at 237. Paradies did not object. "I felt that I couldn't hold a man to a business from which he could not make a living." *Id.* By the end of 1994, Micromuse–MA was failing. Paradies closed the company's doors and let his employees go. He then began doing business as a sole proprietorship under the name of Martex Services. While Micromuse–MA sold nothing after 1994, Paradies sent a potential customer in Japan several e-mails in 1995 and 1996, listing the name of Micromuse–MA in the signature line. According to Paradies, Dawes called him once or twice a year (the last call taking place in 1995) seeking to acquire the Micromuse mark. During these conversations, Paradies never asked Dawes about Micromuse, Ltd.'s business affairs.

In 1995, Dawes established a beachhead in the United States. On February 8, 1995, Micromuse USA, Inc., made its first U.S. sale using the Micromuse mark. In 1996, Micromuse USA, Inc., spent $1.8 million on its United States marketing effort. That figure increased to $9 million in 1997, and $15.7 million in 1998. Shares of stock in Micromuse–DEL traded from a 1998 initial offering price of $12 to a high of $208 in 2002. Micromuse USA Inc., became the exclusive owner of the "MICROMUSE M" mark on June 10, 1997. The Micromuse defendants promoted the mark

6. Karen Paradies' notes were deposited in Micromuse–MA's corporate files.

7. This is the spelling used by the reporter. The parties spell the name as "Micromuse."

extensively in trade publications, general advertising, and at trade shows.

## DISCUSSION

■ Defendants' main thrust is that Paradies' claims of breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and breach of fiduciary duty are barred by the statute of limitations. As jurisdiction is based on diversity of citizenship, the applicable statutes of limitations are those of Massachusetts. *See Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 196 (1st Cir.1983). The statute of limitations is an affirmative defense on which defendants bear the initial burden of proof. *Coastal Oil New England, Inc. v. Citizens Fuels Corp.*, 38 Mass.App. Ct. 26, 29 n. 3, 644 N.E.2d 258 (1995). However, "[w]here summary judgment is sought on the basis of a statute of limitations, once the defendant establishes that the time period between the plaintiff's injury and the plaintiff's complaint exceeds the limitations period set forth in the applicable statute, the plaintiff bears the burden of alleging facts which would take his or her claim outside the statute." *McGuinness v. Cotter*, 412 Mass. 617, 620, 591 N.E.2d 659 (1992).

■ For reasons that will become apparent, I will address the contract-based claims first. Massachusetts imposes a six-year statute of limitations on claims of breach of contract and breach of the implied duty of good faith and fair dealing. G.L. c. 260, § 2. A six-year statute of limitations also applies to unjust enrichment claims based on the same underlying facts. *Palandjian v. Pahlavi*, 614 F.Supp. 1569, 1577 (D.Mass.1985).[8] "The general rule is that a contract action accrues at the time the contract is breached. *Berkshire Mutual Ins. Co. v. Burbank*, 422 Mass. 659, 661, 664 N.E.2d 1188 (1996). "However, the statute will be extended "[i]f a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it ...." G.L. c. 260, § 12.

■ "[A] cause of action accrues on the happening of an event likely to put the plaintiff on notice." *Hendrickson v. Sears*, 365 Mass. 83, 89–90, 310 N.E.2d 131 (1974). Not all harms, however, are imme-

---

**8.** Unjust enrichment is an equitable claim. In this context, the court is being asked to imply a contract in the event that it finds that no enforceable agreement existed between Paradies and Dawes and to order restitution. *See Corbin on Contracts*, rev. ed. § 1.20 (1993). Under the doctrine of unjust enrichment a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable. To satisfy the five elements of unjust enrichment, a plaintiff must show "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *LaSalle Nat'l Bank v. Perelman*, 82 F.Supp.2d 279, 294–295 (D.Del.2000), citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del.Ch.1999). The doctrine does not require any contractual or fiduciary relationship between the parties as a prerequisite of suit. *Greenwald v. Chase Manhattan Mortg. Corp.*, 241 F.3d 76, 78 n. 1 (1st Cir.2001). Where a contract does govern the parties' relationship, the contract provides the measure of the plaintiff's right and no action for unjust enrichment lies. *McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003). This principle is simply an extension of the fifth element of the doctrine, that is, where a plaintiff has an adequate remedy at law, a claim of unjust enrichment is unavailable. *See id.*, at 1093 (Delaware law); *Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F.Supp. 340, 347 (D.Mass. 1982) (federal common-law); *Popponesset Beach Ass'n, Inc. v. Marchillo*, 39 Mass.App. Ct. 586, 593, 658 N.E.2d 983 (1996) (Massachusetts law). As Paradies has a remedy at law, the unjust enrichment claim is redundant.

diately apparent, and the statute of limita-tions is tolled where a plaintiff has been injured by an "inherently unknowable" wrong. *Flynn v. Associated Press,* 401 Mass. 776, 781, 519 N.E.2d 1304 (1988). The "inherently unknowable" criterion is used interchangeably with the "knew or should have known" standard, or as it is more often termed, the discovery rule. *Szymanski v. Boston Mut. Life Ins. Co.,* 56 Mass.App.Ct. 367, 371, 778 N.E.2d 16 (2002). "The discovery rule starts a limitations period running when events occur or facts surface which would cause a reasonably prudent person to become aware that she or he had been harmed." *Felton v. Labor Relations Commission,* 33 Mass. App.Ct. 926, 928, 598 N.E.2d 687 (1992). At that point, the statute of limitations begins to run even if the plaintiff does not know the full extent of his injuries. *Bowen v. Eli Lilly & Co.,* 408 Mass. 204, 207, 557 N.E.2d 739 (1990), citing *Olsen v. Bell Tel. Laboratories, Inc.,* 388 Mass. 171, 175, 445 N.E.2d 609 (1983). This is because a plaintiff, once placed on notice of a potential harm, has a duty to investigate the cause and extent of his injury. *Doucette v. Handy & Harmon,* 35 Mass.App.Ct. 724, 726, 625 N.E.2d 571 (1994).

 Paradies alleges that the contract he reached with Dawes was breached in two material respects. First, he alleges that Dawes failed to convey the one-third interest in Micromuse, Ltd., that was promised in 1989. Second, he alleges that the Micromuse defendants breached the agreement by entering the United States market using the Micromuse name and mark. Paradies filed suit on December 27, 2001. Therefore, the claims of breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment (the contract-based claims) are barred if the claims accrued before December 27, 1995. The relevant dates are the anniversary of Dawes' unfulfilled December 1989 promise to transfer the one-third ownership interest, and the entry of the Micromuse defendants into the United States market in February of 1995, all of which occurred outside the reach back date of the filing of the Complaint.[9] Thus, Paradies' contract-based claims are time-barred unless Paradies can show facts that would toll the statutes of limitations to at least December 27, 1995. *Williams v. Ely,* 423 Mass. 467, 474, 668 N.E.2d 799 (1996).

As to the first claim, Paradies testified as follows.

Q. And as a result of your negotiations in the December 1989 telephone conversation, Mr. Dawes agreed to convey to MicroMuse of Massachusetts a one-third interest in MicroMuse, Ltd.; correct?

A. He agreed to that, yes.

Q. And did you discuss with Mr. Dawes any time period by when he would convey that one-third interest?

A. Not in that conversation.

---

9. Where a contract uses a general term such as "any time," or otherwise fails to impose a time limit, the law will impute a reasonable time limitation. *Peterson v. Tremain,* 35 Mass.App.Ct. 422, 425, 621 N.E.2d 385 (1993); *Lubin & Meyer, P.C. v. Lubin,* 427 Mass. 304, 309–310, 693 N.E.2d 136 (1998). *See also Charles River Park, Inc. v. Boston Redevelopment Authority,* 28 Mass.App.Ct. 795, 814, 557 N.E.2d 20 (1990) ("[I]n the absence of such a specific requirement, the time for performance does not extend forever but only for a reasonable time."). What is a reasonable time is a question of law. *Campbell v. Whoriskey,* 170 Mass. 63, 67, 48 N.E. 1070 (1898); *Town of Middleborough v. Middleborough Gas & Elec. Dep't.,* 47 Mass.App. Ct. 655, 658, 715 N.E.2d 467 (1999). I deem one year to be a reasonable time for performance under the circumstances of this case.

Q. All right. Was there an agreement on such a time period to your knowledge?

A. No.

Q. Did Mr. Dawes ever convey the one-third interest in MicroMuse, Ltd., that he indicated he would do?

A. No.

Q. And I take it from the pleadings in the case that you consider that to be a breach of his agreement reached in 1989; is that correct?

A. That's correct.

Q. After December of 1989, when Mr. Dawes failed to deliver what you were expecting, the one-third interest in MicroMuse, Ltd., did you ever have any communication with him about that?

A. He told me that the business was no longer profitable, the 386 Unix business was marginal, was not profitable, and he was going to go into a different business.

Q. When did that discussion take place?

A. In early 1990.[10]

Q. Did you indicate to him that based on that you no longer want[ed] to take on behalf of MicroMuse, the Massachusetts corporation, a one-third stake in his company?

A. I didn't indicate to him anything at all. I simply listened to what he said.

Q. And you didn't have any comment in response to what he said?

A. I didn't have any comment. I felt that I couldn't hold a man to a business from which he could not make a living.

Q. So, from that am I to understand that it was your intention not to hold him to the agreement that he had made with you?

A. No. I mean, if he had continued in the business, then I would have expected him, like a partner would do, to act like a partner.

Q. And by that you mean to honor his agreement to convey that one-third stake in MicroMuse, Ltd., to Micro-Muse of Massachusetts?

A. Certainly.... I would have expected him to honor his agreements, yes.

Paradies Deposition, at 236–238.

According to Paradies, the transfer of an unspecified interest in Micromuse, Ltd., to Micromuse–MA was first discussed in August of 1989 during Dawes' initial visit to Woburn. The contract was formed in December of 1989 when Dawes agreed that Paradies (Micromuse–MA) would receive a one-third interest in Micromuse, Ltd. Paradies concedes that when nearly a year later, Dawes spoke with Karen Paradies about the success that Micromuse, Ltd, was enjoying, he knew that Dawes had not transferred the promised ownership interest to Micromuse–MA. At that point, Paradies had all the facts necessary to determine that Dawes was in breach of their contract.

■■■■ Paradies maintains that he forbore acting on this knowledge because Dawes in early 1991 led him to believe that Micromuse, Ltd., was no longer profitable. "Under equitable estoppel, a plaintiff can 'escape the consequences of his lack of diligence in bringing his action ... by way of proof that the defendants lulled the

---

**10.** Paradies later testified that the phone call occurred in early 1991. Given that Paradies is the nonmoving party, the court will assume that Paradies was mistaken and that this telephone conversation took place in January or February of 1991.

plaintiff into the delay.'" *Kozikowski v. Toll Bros., Inc.,* 354 F.3d 16, 24 (1st Cir. 2003), quoting *Coady v. Marvin Lumber and Cedar Co.,* 167 F.Supp.2d 166, 171 (D.Mass.2001). "For the doctrine [of equitable tolling] to apply, the [plaintiffs] must satisfy a three-part test, showing: (1) that [the defendant] made representations that it knew or should have known would induce the [plaintiffs] to postpone bringing a suit; (2) that they did in fact delay bringing a suit in reliance on those representations; and (3) that reliance on those representations was reasonable." *Id.,* citing *O'Blenes v. Zoning Bd. of Appeals of Lynn,* 397 Mass. 555, 558, 492 N.E.2d 354 (1986).

In applying this test, it is apparent that Paradies can satisfy neither the first nor the third prongs. There is simply no plausible basis upon which one could suppose that Dawes' statement that the Unix portion of his business was no longer profitable was intended to forestall Paradies from bringing a lawsuit to enforce the promised transfer. Indeed, there is nothing in the record to suggest that the prospect of a lawsuit was ever raised by either Paradies or Dawes. Assuming, however, that Paradies is being truthful in stating that he relied on that statement in deciding against bringing suit, no reasonable trier of fact could find such reliance reasonable. Moreover, while "Massachusetts cases are unclear as to whether plaintiffs who make no effort to investigate may nonetheless benefit from the doctrine of equitable tolling.... [a] party seeking to toll the statute must at the very least show that the information *could not* have been found by a timely diligent inquiry ...." *Bernier v. The Upjohn Co.,* 144 F.3d 178, 180 (1st Cir.1998). It would be incredible to presume (Paradies to his credit does not claim otherwise) that Paradies could not have easily verified the truth of Dawes' statement about Micromuse, Ltd.'s profitability.[11] That Dawes' statement may have inspired Paradies in the subjective belief that Micromuse, Ltd. (contrary to the glowing sales report that Dawes had submitted just two months earlier) was not the prize that he ultimately learned it to be, may be relevant to the extent, but not to the fact of Paradies' injury. Paradies does not claim that Dawes made any misrepresentation about the promised ownership interest itself, for example, by telling him falsely that the transfer of ownership had been or would be made. In other words, the fact that Dawes had not kept his promise was never concealed from Paradies. Consequently, there are no disputed facts a jury's resolution of which would toll the statute of limitations on the ownership claim.

 The same is true of Paradies' claim that Dawes breached their agreement by selling Micromuse products in the United States.[12] There is no suggestion

**11.** In his deposition, Paradies conceded that "it would not have been difficult to find out" the true state of Micromuse, Ltd.'s financials, particularly after February of 1995, when Micromuse, Inc., began selling in the United States using the Micromuse mark. *Id.* at 322.

**12.** While this claim is also made against the Micromuse defendants, it is difficult to see how they could be bound by an agreement reached between Dawes and Paradies personally before any of the accused corporations came into existence. Paradies conceded at his deposition that in their dealings Dawes was acting in an individual capacity, and not as the representative of Micromuse, Ltd. Paradies Deposition, at 232–233. There is no credible suggestion that the Micromuse defendants were alter egos of Dawes, *cf. Birbara v. Locke,* 99 F.3d 1233, 1238 (1st Cir.1996), or that there was a subsequent novation of the agreement by any of the Micromuse defendants. 12 Lord & Williston, *Williston on Contracts* § 35:71 (1999). However, as the *statute of limitations is conclusive as to all defendants on the contract-based claims, I will*

that Dawes made himself inaccessible to Paradies[13] or that the Micromuse defendants concealed their marketing efforts. On February 8, 1995, Micromuse USA, Inc., began doing business in the United States using the Micromuse mark. It advertised extensively. It was the subject of a number of reports in the trade press and financial media from 1995 onward. Its stock price was listed daily in the widely published NASDAQ table after the initial public offering in February of 1998. The statute of limitations on the second alleged breach consequently ran in February of 2001, ten months before Paradies filed his Complaint.[14]

▇ Paradies does not seriously dispute the fact that the discovery rule would ordinarily defeat any recovery dependent on his contract-based claims. He argues instead that the discovery rule does not apply in his case because "the evidence on

the record creates genuine issues of material fact as to whether plaintiffs and defendants were in a fiduciary relationship in connection with the joint venture at issue in this case." Opposition to Micromuse Defendants, at 14. As a matter of law, Paradies is correct in the proposition that "joint venturers unquestionably owe one another a generalized duty of good faith and utmost loyalty."[15] *Petricca Development Ltd. Partnership v. Pioneer Development,* 214 F.3d 216, 220 (1st Cir.2000), citing, *inter alia, Zimmerman v. Bogoff,* 402 Mass. 650, 660, 524 N.E.2d 849 (1988). There is, however, some initial difficulty in discerning the exact duty that Dawes is alleged to have breached. Paradies' most definitive explanation is that "the oral contractual agreement between the parties was breached by the actions of the defendant, wherein the defendant lied to the

---

simply note this argument as an alternative ground on which judgment for the Micromuse defendants could be granted. I am less sanguine about defendants' arguments that Paradies' contract claims are barred by the Statute of Frauds. While this would seem a textbook case illustrating the policy considerations underlying the venerable Statute of Frauds, "[i]n the United States, [the statute] has been 'the subject of constant erosion. Courts have long been receptive to pleas that the statute should be narrowly interpreted so as not to cover the contract in question.' " *Schara v. Commercial Envelope Mfg. Co., Inc.,* 321 F.3d 240, 243 (1st Cir.2003), quoting 2 E.A. Farnsworth, *Farnsworth on Contracts* § 6.1, at 98–99 (2d ed.1998). More specifically, it its not clear that the agreement between Dawes and Paradies involved a sale of securities (as would have been covered by former G.L. c. 107, § 8–319). *See Maurer v. E.A. Gralia Constr. Co., Inc.,* 37 Mass.App.Ct. 403, 406–407, 640 N.E.2d 484 (1994). Nor (despite Paradies' statements to the contrary) is it clear that the agreement could not have been consummated within a year as G.L. c. 259, § 1 requires. *See* n. 9, *supra.*

13. Paradies volunteered the fact at deposition that Dawes had called him once or twice a

year from 1991 through 1995 to inquire about the Micromuse mark.

14. While it is true that "the question when a plaintiff knew or should have known of his cause of action is one of fact which in most instances will be decided by the trier of fact," *Riley v. Presnell,* 409 Mass. 239, 240, 565 N.E.2d 780 (1991), Paradies has produced no facts from which a reasonable jury could conclude that the injury to Micromuse–MA was "inherently unknowable," or for that matter, unknown.

15. A fiduciary duty also arises in the close corporation context. Stockholders in a close corporation are held to a "standard of fiduciary duty more exacting than the traditional good faith and inherent fairness standard." *Donahue v. Rodd Electrotype Co. of New England, Inc.,* 367 Mass. 578, 595, 328 N.E.2d 505 (1975). Paradies in a footnote argues that a fiduciary duty also arose because of Paradies' "joint ownership with Dawes in the closely held [Micromuse, Ltd.] corporation." This is not true for the obvious reason that Paradies was never a shareholder in Micromuse, Ltd., because the transfer of ownership to Micromuse–MA never occurred.

plaintiff in early 1991 by informing him that Micromuse Limited['s] business in the United Kingdom had declined and that defendant no longer required the plaintiff's products along with other agreed-upon assistance." Opposition to Micromuse Defendants, at 13. The argument, apparently, is that Dawes breached a duty that he owed to Micromuse–MA to provide candid financial information about Micromuse, Ltd., and in so doing, caused Paradies to forgo insistence on the transfer of the promised ownership interest to Micromuse–MA. As a result, Paradies argues that equitable tolling should apply to all of his contract-based claims, even those that were discoverable.

■■■ There is a superficial plausibility to Paradies' argument. A claim of breach of fiduciary duty is ordinarily governed by a three year statute of limitations. *Kirley v. Kirley,* 25 Mass.App.Ct. 651, 653–54, 521 N.E.2d 1041 (1988). However, the statute is tolled under G.L. c. 260, § 12, "if the wrongdoer, either through actual fraud or in breach of a fiduciary duty of full disclosure, keeps from the person injured knowledge of the facts giving rise to a cause of action and the means for acquiring knowledge of such facts." *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 106, 406 N.E.2d 678 (1980).

> An actual knowledge standard applies to a plaintiff who argues that a breach of fiduciary duty of disclosure constitutes fraudulent concealment under G.L. c. 260, § 12. Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary. *Puritan Medical Ctr., Inc. [v. Cashman,* 413 Mass. 167], *supra* at 176–177[, 596 N.E.2d 1004 (1992)]. The plaintiff is not required to have made an independent investigation. *Stetson v. French,* [321 Mass.195] *supra*

at 199[, 72 N.E.2d 410 (1947)]. *See Sanguinetti v. Nantucket Constr. Co.,* 5 Mass.App.Ct. 227, 237–238[, 361 N.E.2d 954] (1977) (claim not barred where attorney fraudulently concealed through failure fully to disclose, and client lacked actual knowledge of facts).

*Demoulas v. Demoulas Super Markets, Inc.,* 424 Mass. 501, 519–520, 677 N.E.2d 159 (1997). In this respect, Massachusetts and federal law differ in that the federal fraudulent concealment doctrine incorporates the discovery rule. Thus, a claim that would be stale under federal law because of a plaintiff's failure to conduct a diligent inquiry will often survive under Massachusetts law. *Id.* at 520 n. 26, 677 N.E.2d 159. The critical point, however, is that "[t]he statute of limitations ... is not tolled if the plaintiff has actual knowledge of the facts giving rise to his cause of action." *Stark v. Advanced Magnetics, Inc.,* 50 Mass.App.Ct. 226, 233–234, 736 N.E.2d 434 (2000). *See also Patsos v. First Albany Corp.,* 433 Mass. 323, 329, 741 N.E.2d 841 (2001).

■■■ As a preliminary matter, whether Dawes owed Paradies a fiduciary duty as a joint venturer is questionable at best.

> It may not be possible to identify criteria for the existence of a joint venture with any definiteness. Nevertheless, the following pragmatic check list suggests considerations which, if present or absent, may bear upon the recognition of one: (1) an agreement by the parties manifesting their intention to associate for joint profit not amounting to a partnership or a corporation; (2) a contribution of money, property, effort, knowledge, skill, or other assets to a common undertaking; (3) a joint property interest in all or parts of the subject matter of the venture; (4) a right to participate in the control or management of the

enterprise; (5) an expectation of profit; (6) a right to share in profits; (7) an express or implied duty to share in losses; and (8) a limitation to a single undertaking (or possibly a small number of enterprises). *Shain Investment Co., Inc. v. Cohen*, 15 Mass.App.Ct. 4, 8–9, 443 N.E.2d 126 (1982). While the agreement alleged by Paradies incorporates a number of these indicia, "the 'right to participate in the control or management of the enterprise' is important, and may even be an essential element of a 'textbook joint venture' . . . ." *Judge v. Gallagher*, 17 Mass.App.Ct. 636, 640, 461 N.E.2d 261 (1984). Nowhere in the record, as defendants point out, including Paradies' lengthy deposition testimony, is there any suggestion that Paradies had a right to participate or played a role in the management of Micromuse, Ltd. Assuming, however, in Paradies' favor, that a joint venture did arise from the August 1989 agreement, it was terminated by Dawes in November of 1990, when he informed Micromuse–MA (through Karen Paradies) that he had switched his purchases of UNIX equipment to another supplier (a conversation confirmed by Karen Paradies' corporate notes). *Cf. Demoulas*, 424 Mass. at 518, 677 N.E.2d 159 (a cause of action for breach of fiduciary duty arises when a fiduciary repudiates his obligations and the partner has knowledge of the repudiation). Thus, even if Dawes and Paradies during the duration of their business relationship "owed to each other [as fiduciaries] the utmost good faith and loyalty,"

*Cardullo v. Landau*, 329 Mass. 5, 8, 105 N.E.2d 843 (1952), that was no longer the case after Dawes in November of 1990 repudiated Micromuse, Ltd.'s "single undertaking" (to act as the "arm" of Micromuse–MA in the sale of its products in Europe).[16]

█ In this regard, it is telling that Paradies makes no complaint about Dawes' conduct of the alleged venture for so long as it lasted. Dawes ordered product exclusively from Micromuse–MA. He paid for it. He promoted it. And he accurately reported Micromuse, Ltd.'s sales figures to Micromuse–MA. Paradies' complaint centers rather on Dawes' 1991 statement about the health of Micromuse, Ltd.'s UNIX business, which by Paradies' account, caused him to relinquish Micromuse–MA's right to the one-third share of Micromuse, Ltd. The argument founders on two essential and undisputed facts: Paradies knew that Micromuse–MA was entitled to the transfer of ownership; and he knew that the transfer had not taken place. Thus, even if Dawes, in disregard of a fiduciary duty, intentionally misled Paradies about the true value of an ownership interest in Micromuse, Ltd., Paradies had actual knowledge that Micromuse–MA had not received that to which it was entitled, and despite that knowledge, failed to act to enforce Micromuse–MA' rights before the statute of limitations ran.[17]

█ Paradies' remaining claims of false designation of origin under section

---

16. Dawes' statement to Paradies in early 1991, that Micromuse, Ltd., was barely making money from their joint 386 UNIX business, was not necessarily inconsistent with what he had earlier told Karen Paradies about why he was no longer buying Unix-based products from Micromuse–MA.

17. Even if the breach of fiduciary duty claim were deemed to survive, it would not rescue

(as Paradies seems to assume) the contract-based claims to which the discovery rule indisputably applies. *See Lareau v. Page*, 39 F.3d 384, 389 (1st Cir.1994) ("We think that Massachusetts would not allow 'parasitic' claims to defeat the purposes of the discovery rule such that plaintiffs who fail to discover their 'host' claims in time may nonetheless sue for later-discovered 'parasitic' claims.").

43(a) of the Lanham Act and violation of the Anticybersquatting Consumer Protection Act (ACPA), 15 U.S.C. § 1125(d), turn on an identical issue, whether Paradies can show ownership of the Micromuse mark.[18] "To prevail in an action for trademark (or service mark) infringement, the plaintiff must establish: '(1) that he uses, and thereby 'owns' a mark, (2) that the defendant is using that same or a similar mark, and (3) that the defendant's use is likely to confuse the public, thereby harming the plaintiff.'" *Star Financial Services, Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 9 (1st Cir.1996), quoting *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 605 (1st Cir.1992). To establish bona fide use of a mark, a plaintiff must show use "in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. Use may be shown by evidence of actual sales, or by active and continuous efforts to market goods and services associated with the mark. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16.6 (2003). A mark is deemed abandoned "[w]hen its use has been discontinued with [the] intent not to resume such use." 15 U.S.C. § 1127. "Intent not to resume [use of the mark] may be inferred from circumstances." *Id.* See *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1580–1582 (Fed.Cir.1990). Abandonment, being a forfeiture of a property interest, must ordinarily be proved by clear and convincing evidence. 2 *McCarthy*, at § 17.12; *cf. Transgo, Inc. v. Ajac*

*Transmission Parts Corp.*, 768 F.2d 1001, 1017 (9th Cir.1985). Nonuse of a mark for three consecutive years is, however, prima facie evidence of abandonment, 15 U.S.C. § 1127, and shifts the burden of production to the prior user to prove the intent to resume the use of the mark during the period of nonuse. *Abdul–Jabbar v. General Motors Corp.*, 85 F.3d 407, 411 & n. 4 (9th Cir.1996); *Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). Abandonment of a mark results in a loss of the prior owner's rights as against the whole world. 15 U.S.C. §§ 1064(3), 1115(b).

■■■ It is undisputed that Micromuse–MA ceased doing business in 1994, and as Paradies described it, fell into "dormancy." Paradies turned his attention elsewhere, performing computer consulting work under the name of a sole proprietorship, Martex Services.[19] Micromuse–MA did not earn any income from 1995 through 2000, did not file tax returns from 1996 through 1999, did not file annual reports with the Massachusetts Secretary of State from 1993 through 2000, and did not sell any product after laying off its employees in 1994. As shown on its tax returns, Micromuse–MA had no assets after 1994. The only use of the name Micromuse after 1994 that Paradies is able to document is an e-mail signature line on unsuccessful solicitations of business from one of Paradies' former contacts in Japan in late 1996 and early 1997.[20] "When a company per-

18. As the Estate points out, it is improperly named in the cybersquatting count. Damages are not recoverable for the registration or use of a domain name prior to the enactment of the ACPA on November 29, 1999. Dawes had relinquished his entire interest in the Micromuse defendants before that date.

19. Paradies maintains that Martex was an "affiliate" of Micromuse–MA. Opposition to the Micromuse Defendants, at 25. He presents nothing in the way of a documentary

nature to corroborate this somewhat fanciful assertion. What documents do exist (such as the tax returns for Martex and Micromuse–MA) contradict Paradies' assertion.

20. Mere promotion of a mark, if an email signature line qualifies as a "promotion," does not constitute a use within the meaning of the Lanham Act where the promotion is not accompanied by the rendering of any actual goods or services in commerce. 15 U.S.C. § 1127. *See Buti v. Perosa, S.R.L.*, 139

manently goes out of business with no intent to resume, good will is ended and the marks are abandoned." 2 *McCarthy,* at § 17.14. Similarly, when a company ceases business to a point in time when there is no longer an association between the company and the mark, an abandonment occurs for the obvious reason that the association of the mark with the company no longer serves to dispel consumer confusion over the origin of goods and services. *T & T Mfg. Co. v. A.T. Cross Co.,* 449 F.Supp. 813, 823 n. 5 (D.R.I.1978).

Paradies' only rebuttal of the overwhelming evidence that he had abandoned the Micromuse mark are his statements of a subjective intent to someday revive Micromuse–MA as a going concern. Paradies points, for example, to the fact that in 1995, as part of his divorce settlement with Karen Paradies, he assumed her 50 percent share of Micromuse, while she took the marital home, an exchange that he claims was "sufficient to demonstrate the Micromuse mark as a valuable asset and establishes plaintiffs' unmistakable intention to use the Micromuse mark." Opposition to Micromuse Defendants, at 27. His remaining evidence consists of undocumented research he claims to have undertaken to "recreate" a product for eventual sale under the Micromuse name, research that he conceded he had never published or even shown to anyone else. Paradies Deposition III, at 44. What Paradies cannot point to is any use of the mark after 1994 in the rendering of goods or services in commerce.

Nothing in the statute entitles a registrant who has formerly used a mark to overcome a presumption of abandonment arising from subsequent nonuse by

F.3d 98, 103 (2d Cir.1998) (mere advertising of a mark does not constitute "use" under the

simply averring a subjective affirmative "intent not to abandon." As indicated in the quotation from *Exxon,* the Lanham Act was not intended to provide a warehouse for unused marks. *See also Am-Brit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1550, 1 USPQ2d 1161, 1177 (11th Cir. 1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest. Under Fed. R.Civ.P. 56, made applicable to proceedings before the board by 37 C.F.R. § 2.116(a) (1988), one must, however, proffer more than conclusory testimony or affidavits. An averment of no intent to abandon is little more than a denial in a pleading, which is patently insufficient to preclude summary judgment on the ground the facts are disputed. As this court has frequently said in connection with motions for summary judgment, a conclusory statement on the ultimate issue does not create a *genuine* issue of fact. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1564, 4 USPQ2d 1793, 1797 (Fed.Cir.1987); *see also Johnston v. IVAC Corp.,* 885 F.2d 1574, 1578, 12 USPQ2d 1382, 1385 (Fed. Cir.1989). The registrant must put forth evidence with respect to what activities it engaged in during the nonuse period or what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred.

*Imperial Tobacco,* 899 F.2d at 1581.

█ Because Paradies has failed to meet his burden of rebutting the abandon-

Lanham Act).

ment of the Micromuse mark, it follows that summary judgment must enter for the defendants on his Lanham Act and cybersquatting claims.[21]

## ORDER

For the foregoing reasons, plaintiffs' motion to reconsider is *ALLOWED*. Defendants' motions to strike are *DENIED*. The Micromuse defendants' motion for summary judgment is *ALLOWED*. The Estate's motion for summary judgment is also *ALLOWED*. Judgment will enter for the Micromuse defendants on the counterclaims. Defendants shall, within ten (10) days of the date of this Order, submit a proposed form of final judgment.

SO ORDERED.

---

**21.** If the reader is puzzled as to why the same statute of limitations issues that foreclose Paradies' contract-based claims are not also fatal to his Lanham Act claim, the reason is that the Lanham Act, which has no statute of limitations, is not subject to the usual borrowing rule that adopts an analogous state statute of limitations as a federal substitute. *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir.2003). "In determining when a plaintiff's suit should be barred under the Act, courts have consistently used principles of laches as developed by courts of equity." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir.1985). "The equitable defense of laches will bar a party from asserting a claim if the party so unreasonably delayed in bringing the claim that it caused some injury or prejudice to the defendant." *Polaroid Corp. v. The Travelers Indemnity Co.*, 414 Mass. 747, 759–760, 610 N.E.2d 912 (1993). *See also Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The application of the doctrine is within the sound discretion of the district court. *Puerto Rican–American Ins. Co. v. Benjamin Shipping Co., Ltd.*, 829 F.2d 281, 283 (1st Cir. 1987). Given the open and notorious use of the Micromuse mark by the defendants, the argument for the application of the doctrine in this case, if Paradies' Lanham Act and cybersquatting claims were otherwise viable, would be very strong.